PHILIP M. EWING AND MARIAN S. EWING, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3896-84, 13442-84, 13443-84, 14511-84, 27900-84.

Filed August 30, 1988.

---

[1]Cases of the following petitioners were consolidated for trial, briefing, and opinion: Arthur Toll and Charlotte Toll, docket No. 13442-84; Richard B. Leavitt and Roberta Leavitt, docket No. 13443-84; Don A. Czarneski and Lynne C. Czarneski, docket No. 14511-84; and Richard W. Leong and June D. Leong, docket No. 27900-84.

*Bruce I. Hochman, Avram Salkin, James V. Looby,*[2] and *Charles P. Rettig,* for the petitioners.
*Pamela R. Piland,* for the respondent.

SHIELDS, *Judge:* In his notices of deficiency, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows:

| Docket No./ petitioners | Year | Deficiency | Additions to tax | |
| | | | Sec. 6653(a)(1) [3] | Sec. 6653(a)(2) |
| 3896-84 | 1980 | $63,008.00 | $3,150.00 | - - - |
| Ewing(s) | 1981 | 56,444.00 | 2,822.00 | - - - |
| 27900-84 | 1980 | 12,747.00 | 637.35 | - - - |
| Leong(s) | 1981 | 66,212.01 | 3,310.60 | 50% of interest due on $3,310.60 |
| 14511-84 | 1980 | 70,025.92 | 3,501.30 | - - - |
| Czarneski(s) | 1981 | 132,049.49 | 6,602.47 | 50% of interest due on $6,602.47 |
| 13442-84 Toll(s) | 1980 | 85,283.00 | - - - | - - - |

[2]Respondent stipulated that he has no objection to the law firm of Hochman, Salkin & DeRoy and its individual members, including specifically Bruce I. Hochman and Avram Salkin, serving as counsel for petitioners in these proceedings. At the suggestion of the Court, petitioners' counsel also sought and received specific waivers from the individual petitioners with respect to any potential conflict of interest.

[3]All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.

|  |  |  | Additions to tax | |
| Docket No./ petitioners | Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 13443-84 Leavitt(s) | 1980 | 146,041.70 | - - - | - - - |

By amended answers, respondent determined that all petitioners are liable for increased interest under section 6621(c),[4] petitioners in docket No. 3896-84 (Ewings) are liable for an addition to tax under section 6653(a)(2) in 1981 equal to 50 percent of the interest due on $2,822, and petitioners in docket Nos. 13442-84 (Tolls) and 13443-84 (Leavitts) are liable for additions to tax under section 6653(a)(1) in 1980 of $4,264.15 and $7,302.08, respectively. At trial, respondent orally moved that damages be awarded to the United States and against all petitioners under section 6673.

After concessions, the issues remaining for decision are: (1) Whether certain transactions in gold futures were entered into by Mr. Ewing, Mr. Leong, Mr. Czarneski, Mr. Toll, and Mr. Leavitt for profit, and if so, whether their losses from such transactions are ordinary losses or short-term capital losses, and whether their gains from such transactions are long-term or short-term capital gains; (2) whether the fees paid by the male petitioners with respect to such transactions are deductible; (3) whether petitioners are liable for additions to tax under section 6621(c), section 6653(a)(1), and section 6653(a)(2) as determined by respondent; and (4) whether damages should be awarded under section 6673.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits associated therewith are incorporated herein by reference.

The Ewings, Tolls, and Leavitts resided in California at the time their petitions were filed, and their joint income tax returns for the years in issue were filed with the Internal Revenue Service Center at Fresno. The Czarneskis

---

[4]Respondent cites to sec. 6621(d), which was redesignated sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. All such references made herein are to the redesignated section.

and Leongs resided in Texas at the time their petitions were filed, and their joint income tax returns for the years in issue were filed with the Internal Revenue Service Center at Austin. The returns of all petitioners were prepared utilizing the cash receipts and disbursements method of accounting.

As used hereinafter, the words "petitioner" and "petitioners" will refer only to the male petitioners unless otherwise indicated, and the use in our findings of such words and phrases as "loss," "gain," "forward contract," "cancellation," "assignment," "spread," "straddle," "short position," "long position," "transactions," and similar words and phrases are for convenience only, and are not to be construed as a determination of the nature of any act or thing.

Each male petitioner herein is a successful professional or businessman who had a substantial sum of ordinary income from his profession or business during each of the years in issue. On their income tax returns, each petitioner claimed deductions from his professional or business income for losses from the "cancellation" of gold futures contracts in the amounts and for the years shown below:

| Petitioner | Year | Loss |
|---|---|---|
| Ewing | 1980 | $107,563 |
|  | 1981 | 116,096 |
| Toll | 1980 | 103,835 |
| Leavitt | 1980 | 103,835 |
| Czarneski | 1980 | 227,400 |
|  | 1981 | 359,600 |
| Leong | 1980 | 35,000 |
|  | 1981 | 198,200 |

All of the above losses purportedly occurred with respect to transactions in gold futures conducted during 1980 or 1981 in the manner hereinafter described on behalf of petitioners by F.G. Hunter & Associates. Petitioners did not engage in the transactions as dealers.

## Trading in Commodity Futures in General

Trading in futures contracts occurs with respect to commodities including precious metals. In general, a futures contract is an agreement to either deliver (a short position) or receive (a long position) a specified quantity and grade of a designated commodity during a designated month in the

future. A single position calling for the purchase or the sale of a designated commodity is described as an "open contract." However, if the same person acquires a position calling for the purchase of a specified commodity and a different position calling for the sale of the same commodity, his position is described as a straddle and each of such positions is referred to as a "leg" of the straddle.

Persons trading in commodity futures seldom hold contracts to the closing date so as to make or receive delivery of the specified commodity. In fact, it is generally understood that less than 5 percent of all futures contracts actually result in the delivery of the underlying commodity. Instead, such contracts are generally disposed of by a "switch transaction," which is the acquisition of an offsetting contract of purchase or sale of the same quantity of the commodity.

Whenever an open position is held, price changes in the commodity future directly affect the economic position of the holder. By contrast, in a straddle, the holder is economically affected only by changes in the spread, i.e., the difference between the market price of each leg of the straddle. If the prices of the short and long legs of the straddle move exactly in tandem so that the spread does not change, the holder will suffer no economic consequence since his unrealized loss in one leg will be offset by his unrealized gain in the other. However, if the spread widens or narrows, the holder will incur either an economic gain or loss.

The potential for gain or loss in a straddle transaction is a function of the change in the price relationship or differential between the delivery months. The price differential, in turn, is a function primarily of the changes in short-term interest rates and the value of the underlying commodity and secondarily of storage and commission costs. Because storage costs are trivial for precious metals, the major forces affecting a gold futures spread are movements in gold prices and short-term interest rates.

Whenever a leg of a straddle is closed out by the purchase of an exactly opposite position, or in any other manner, tax consequences normally will result to the holder in either a realized gain or loss. In such a case, where the

straddle consists of only two positions, that position which is not closed out becomes simply an open contract. As a general rule in tax-motivated straddle trading, the loss leg will be closed out first in order to generate a tax loss for the holder. When this occurs, the remaining leg of the initial straddle containing an unrealized gain, which is usually almost identical to the amount of loss in the closed leg, constitutes an open position for the holder, and as such, is subject to the increased risk of being directly affected by the market. To minimize this risk, the holder would be expected to obtain a new position similar to the one in the closed loss leg except for a different month. This substitution of one position for a similar position in a different month (switching) of the loss leg in the initial year in order to generate a tax loss which is offset by the unrealized gain in the other leg of the straddle is a pattern usually found in the trading of tax straddles.

Straddle transactions having as their principal objective "deferrals" (postponing to a later year an already realized gain in an unrelated transaction) or "conversions" (changing a short-term capital gain on an unrelated transaction to a long-term capital gain) are commonly referred to as "tax straddles" in the industry.

A "butterfly straddle" is a straddle consisting of at least three legs. It is essentially a combination of two straddles that, when drawn schematically, resembles a butterfly. For example, the following would be a butterfly straddle with four legs:

Long March 1981                    Long December 1981
                Short July 1981
                Short July 1981

The middle position or "body" of a butterfly straddle is exactly twice the size of each outside position or "wing." In a butterfly straddle, each straddle is traded separately and will usually have two different spread price differentials. Such a straddle typically presents less chance of either an adverse or a favorable spread movement, and hence is less likely to produce a difference loss or difference gain than an ordinary straddle. Furthermore, a butterfly straddle containing delivery months encompassing only a brief period (e.g.,

a May 1981/July 1981/September 1981 straddle) typically presents less chance of loss or gain than a butterfly straddle spread over a longer period (e.g., a March 1981/July 1981/December 1981 straddle).

It is generally understood that about 85 to 90 percent of trades in commodity futures result in losses. Nevertheless, there are opportunities for realizing profits in such trading, including trading in straddles. The use of a straddle tends to minimize the risk of loss, but at the same time, it reduces the opportunity for profit. This is true because every position held by one holder is matched by an exactly opposite position (or group or series of positions) held by one or more other holders. Thus, a loss realized by one holder on closeout will be matched by the realization of a gain in the same amount by the holder or holders of the opposite position, provided the opposite position was acquired at the same time and held to the closeout.

## The Program Participated in by Petitioners

In late 1979 or early 1980, Avram Salkin (Salkin), a member of the law firm of Hochman, Salkin & DeRoy, Los Angeles, California, organized F.G. Hunter & Associates (Hunter) as a Nevada limited partnership for the purpose of operating a commodities brokerage firm. Subsequently, on February 20, 1980, Hunter was registered with the Commodities Futures Trading Commission (CFTC) as a Futures Commodity Merchant. As such, Hunter was authorized during 1980 and 1981 to execute trades for its customers through member brokers on Commodity Exchange, Inc. (COMEX). All of the transactions at issue in this case were executed on Hunter's behalf on COMEX by A.G. Becker, a member broker. COMEX has been designated a "board of trade" by CFTC, and futures contracts are regularly traded on COMEX on weekdays pursuant to rules and regulations approved by CFTC. The mechanics of trading in commodity futures on COMEX is discussed in detail in *Smith v. Commissioner*, 78 T.C. 350 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987).

Beginning in 1980, and continuing through 1981, Hunter was engaged in a promotion known as An Investment Program in Spreading the Gold Futures Market. A substan-

tial portion of the materials used in the promotion was devoted to "certain technical services which should provide clients with some substantial tax benefits," and prospective investors had access to a brochure entitled "Spreading the Gold Futures Market," which contains the following claims:

By utilizing certain techniques which have been developed the client can reasonably expect to profit from both a cash and tax standpoint. This is not to imply that every client will make both a cash and tax profit. With any investment program the risk of loss is commensurate with the opportunities for profit. However, the opportunity for profit can be considerably enhanced and the risk of loss substantially reduced by taking advantage of the Company's tax saving techniques.

The price of gold can move up or down $100/oz. in a matter of months. If for example, a client invested $18,500 in 20 Gold Bull Spreads with the CFIR at 20% and the price of gold went up $100 and interest rates increased 4%, the client would make $14,680 cash profit and have an additional $114,120 of net ordinary losses to shelter other income. However, had the market gone against him in the above conditions, he would have lost $14,680 in cash and would have $134,680 of net ordinary losses to shelter other income.

In a section entitled "Questions and Answers on Gold Futures" the brochure provided the following information:

2. *How can I expect to gain?*

By wisely selecting the sequence of your long and short contracts, you may realize a substantial profit from a change in either the price of gold or generally prevailing interest rates.

3. *Can I lose my investment?*

Yes. As with any investment, the risk of loss is commensurate with the opportunities for profit. However, the opportunity for profit can be considerably enhanced, and the risk of loss is almost eliminated by our tax saving techniques.

\*　　\*　　\*　　\*　　\*　　\*　　\*

9. *How can the probability of gain be increased by choice of liquidation methods?*

Income tax treatment of your gains or losses on each contract will be different depending upon your tax bracket, your risk of after tax loss on both of these contracts will be very substantially reduced and will usually be converted into an after tax gain. Any net pre-tax profit will be significantly increased through tax savings. If you cancel the contract which is in the losing position you receive (based on Tax precedents) an ordinary loss. If you sell or assign a short contract which shows a profit you receive Long Term Capital Gains (LTCG).

10. *Precisely how do I achieve LTCG and Ordinary Losses?*

(a) If there is a *gain* in your long position, you should *qualify* for *capital gains* treatment providing you have held your contract for greater than six months, by going short in the same delivery month. F.G. Hunter will perform this service.

(b) If you have a gain in your *short* position you *could sell* it to an *unrelated third party* and qualify for capital gains treatment providing you have held your contract for greater than six months.

(c) If you have a *loss* in either your long or short position, you should *cancel* it. If you do, your loss will be an *ordinary loss* rather than a capital loss. F.G. Hunter will perform this service.

### 11. *Can I sell a short futures contract?*

Your contract with F.G. Hunter & Associates has an assignment provision which facilitates its sale to a third party. The third party will probably want to buy your contract for a slight discount but this should not materially affect your results.

### 12. *Can I cancel a futures contract?*

Your contract with F.G. Hunter & Associates also has a cancellation provision. The cancellation charge would be equal to the difference between the then current market price of your contract and the original contract price, plus a cancellation charge of $25 per contract.

## In a glossary, the brochure provided the following definitions of tax terms and examples of possible tax benefits:

(a) Capital Gain

(1) Long term: The holding period (length of ownership) for commodity futures contracts to achieve long term capital gains tax treatment is more than six months. For most other types of investments the required holding period is more than one year. Maximum tax is 28% for individuals in a 70% tax bracket and the maximum tax for a corporation is 28% for a corporation in a 46% tax bracket. Sixty percent of LTCG is excluded from taxation for individuals only.

(2) Short term: Ownership has been for less than six months for futures, and less than one year for most other investments. Maximum tax is 70% for individuals and 46% for corporations.

(b) Ordinary Loss

Is a loss that is deductible dollar for dollar against both earned (ordinary) and unearned (passive) income. There is no limit on the amount of loss which you can deduct in the current year. For example, if you have a $100,000 ordinary loss and a $100,000 long term capital gain you would have an actual cash profit of zero. However your tax savings would be as follows:

Assume 50% tax bracket.

| | |
|---|---|
| $100,000 Ordinary loss 100% deductable | $-100,000$ |
| $100,000 LTCG $\times$ 40% taxable | $\underline{40,000}$ Taxable gain |
| Net ordinary loss | $\overline{-60,000}$ |
| | $\underline{\times\ 50\%}$ Tax bracket |
| Tax savings | $\overline{30,000}$ |

(c) Carry Back and Carry Forward

An individual and a corporation can carry non-business ordinary losses back for three years and forward for seven years. However special rules apply to individuals regarding the carry back. Consult your tax advisor.

(d) Income

(1) Ordinary: Or earned income is the money you make from employment, salaries, wages, commissions, tips, bonuses, etc. Maximum rate is 50%.

(2) Passive: Or unearned income is generally the money you receive from investments i.e. dividends, rents, royalties, etc. Maximum rate is 70%.

(e) Cancellation

Any contract may be cancelled. Upon cancelling a contract both parties are returned to pre-contract position minus a cancellation fee of $25. The contract ceases to exist and no longer has any binding powers to any party. The cancellation of a contract gives rise to an ordinary loss or gain. (See tax opinion). You only cancel losing positions you never cancel winning positions.

(f) Assignment:

Sell or assign short futures contract to disinterested third party gives rise to long term capital gain if held six months or longer. You only assign or sell a short winning position never a long winning position.

A second brochure provided to prospective investors contained a further list of questions and answers, a few of which are as follows:

8. *How can the probability of gain be increased by choice of liquidation methods?*

Income tax treatment of your gains or losses on each contract will be different depending upon the way your contract is closed out. There are ways to close out a contract in which you have a gain so that it will be taxed as a long term capital gain. For the contract in which you have a loss, you may liquidate so as to have ordinary loss. Depending upon your tax bracket, your risk of after tax loss on both of these contracts will be very substantially reduced and will quite possibly be converted into an after tax gain. Any net pre-tax profit will be significantly increased.

            *      *      *      *      *      *      *

11. *Would the same results be realized with other choices of dates?*

The results that would have been achieved with other choices of dates would be different. However, the principles are the same if these conditions apply. (1) The contracts are closed out after the expiration of the six months capital gains holding period, (2) The contract on which you have a gain is closed out in a way which will qualify for capital gains tax treatment, and (3) the contract on which you have a loss is closed out in a way which will qualify for ordinary income tax treatment.

12. *Precisely how do I meet conditions (2) and (3) in question #11?*

If there is a gain in your long position, you should qualify for capital gains treatment by going short in the same delivery month. If you have a gain in your short position, you could sell it to an unrelated third party and qualify for capital gains treatment. If you have a loss in either your long or short contract, you should cancel it. If you do, your loss will be an ordinary loss rather than a capital loss.

Hunter's promotional materials also included a tax opinion issued by Hochman, Salkin & DeRoy which was read and relied upon by each petitioner. The opinion, prepared by Salkin, described in detail, with citations to case law and statutes, the tax consequences which, in the opinion of the author, could be expected by investors from different methods of closing positions in straddles. In general, the opinion stated: (1) That if a profitable long futures contract was closed via offset, a long-term capital gain would result if the contract had been held for more than 6 months; (2) that if a profitable short futures contract was closed via offset, a short-term capital gain would result, even if the contract had been held for more than 6 months due to the special short sale rules contained in section 1233(b); (3) that if a profitable short futures contract was sold to an unrelated third-party via assignment, a long-term capital gain would result if the contract was held for more than 6 months; and (4) that if a losing long or short futures contract was canceled, no sale or exchange occurred and thus the loss would be an ordinary loss.

Each investor in the program was required by Hunter to sign an "Account Agreement" which provided in pertinent part:

Gentlemen:

In consideration of your accepting my account and your agreement to act as my broker, I agree to the following with respect to any of my accounts with you for the purchase and sale of commodities, purchases of commodities futures contracts, and sale and cancellation of commodities futures contracts:

1. * * *

2. Margin and Operation of Account. I agree to post such deposits and maintain such collateral and/or margin as you may in your discretion require from time to time and will pay on demand any amount owing with respect to any of my accounts.

A. If I hold a "short" position in any commodity contract, it is understood that I have the following options:

(1) To sell said contract through you on the open market.

(2) To furnish you with all necessary delivery documents as to enable you to make delivery thereof under the terms of the contract.

(3) To furnish you with all information and documents necessary for you to enact a transfer of my account or any individual position therein.

(4) I shall have the right to cancel said contract by paying to or receiving from you (i) the market price of said commodity contract as of the date that you receive notice of my intention to cancel, reduced by (ii) the contract price at which I would have been required to make delivery, reduced by (iii) a cancellation fee. Upon cancellation there shall be no further binding obligations on either party with respect to the cancelled contract.

(5) To instruct you to make a purchase of a contract for delivery of the same month as my short contract, which shall cause my short contract to be offset and thereby terminated.

B. With respect to any contract to purchase a given commodity at a given time, I shall have the right to cause any of the following to take place:

(1) Accept delivery of the commodity covered by said contract upon payment of the contract price in cash, or upon such terms as we may mutually agree.

(2) To instruct you to sell said contract prior to the date of delivery.

(3) To furnish you with all information and documents necessary for you to enact a transfer of my account or any individual position therein.

(4) To instruct you to make a short sale of a contract for delivery of the same commodity for the same month as my contract to be offset and thereby terminated.

(5) I shall have the right to cancel said contract by paying to you or receiving from you an amount equal to the difference between (i) the original contract price, reduced by (ii) the market price of said contract as of the date of cancellation, reduced by (iii) a cancellation fee. Upon cancellation there shall be no further binding obligations on either party with respect to the cancelled contract.

Prospective investors including petitioners herein were required to submit account applications to Hunter and, upon their acceptance, were required to execute a standardized account agreement and risk disclosure (account agreement). As a general rule, each new investor also received from Hunter a separate risk disclosure statement and a document reflecting Hunter's current policies and fees. However, petitioners Arthur Toll and Richard B. Leavitt, through their partnership, C.D. Associates, entered into a separate letter agreement with Hunter covering commissions, margin requirements, fees, and other financial ar-

rangements. All petitioners were generally familiar with Hunter's program and had access to and read Salkin's tax opinion.

After depositing sufficient funds with Hunter to meet their "margin requirements," as well as any applicable fees and commissions, a customer was permitted to commence trading with Hunter. To do this, the customer would advise Hunter of the position he desired with respect to gold futures. Hunter would then direct A.G. Becker by telephone to execute the order at COMEX. A.G. Becker, in turn, would execute the necessary transactions on the exchange floor at COMEX and confirm the transactions as between itself and Hunter. Hunter would then confirm the transactions with its client by issuing a customer contract reflecting the client's position, price, and a time stamp, as well as a separate confirmation document which reflected the position, prices, margin, and commissions. After the client had reviewed and approved the transaction documents, the customer contract was signed by the client and by a Hunter representative.

To liquidate a position, an investor was counseled by Hunter as to whether he should offset, cancel, or assign his contracts. Hunter's fee for each type of transaction was as follows:

| | |
|---|---|
| Offset | $10 per contract |
| Cancellation | 25 per contract |
| Assignment | 35 per contract |

At the option of the investor, Hunter would charge an additional fee of $20 per spread which was paid by Hunter to the law firm of Hochman, Salkin & DeRoy for the legal defense of any tax loss reported by the investor.

If the customer was holding a contract containing a loss, Hunter would recommend cancellation and, with the customer's permission, Hunter would cancel the contract, assume the customer's position on the contract, establish an offset position to protect itself, and pay the customer the net cancellation price (the market value of the contract at the time of cancellation less the $25 cancellation fee, the $20 legal fee if any, and the $10 offset fee). Any gain or loss realized on the ultimate disposition of the contract would be pocketed or absorbed as the case might be by Hunter.

If the customer was holding a contract containing an unrealized gain, Hunter would assign the contract at a discount to R.A. Breckenridge, Inc. (Breckenridge), a trader in commodity futures. Hunter would pay its customer the discounted price received from Breckenridge less the assignment fee of $35. Breckenridge would then terminate the contract on the floor of COMEX and retain the difference.

When any change in a position with a customer occurred, Hunter entered an appropriate notation in the applicable customer account indicating the type of transaction, price, gain or loss, and the date and hour of the transaction. Hunter also regularly issued monthly and annual statements to its customers reflecting the status of their accounts.

### Philip Ewing and His Participation

Philip Ewing (Ewing) graduated from Ohio State University in 1943 with a bachelor of science degree in business administration and received a master's degree in business administration from Harvard University in 1948. Throughout the years in issue, he was the president and part owner of a corporate hardware manufacturer. Prior to 1980, he had been involved in a number of investment activities both for his own account and as an investment manager for others. He regarded Hochman, Salkin & DeRoy as a credible law firm and relied upon their opinion in formulating his investment decisions.

Complete details with respect to Hunter's transactions for Ewing during the years 1980 and 1981 are set out in Appendix I, and only a brief synopsis is needed here. By reference to Appendix I, it will be noted that on December 5, 1980, Hunter initiated a series of straddle trades for Ewing in gold futures that continued into 1982. Throughout the series of trades, a balanced position (i.e., an equal number of long and short contracts) was maintained for Ewing although the long and short contracts were for different delivery months. At the beginning (December 5, 1980) his position in the market (20 Short Feb. '82 and 20 Long Apr. '82) was essentially a 2-month bull spread, i.e., a spread which would be expected to yield a profit in a bull market as contrasted with a bear spread which would be

expected to yield a profit in a bear market. In a bull spread, the near contract is short and the far contract is long because historically the long contract will gain on the short in such a spread. Generally speaking, in a bear spread the contracts are reversed, and the short contract should gain on the long. See *Smith v. Commissioner*, 78 T.C. at 355.

Five days later, on December 10, 1980, the 20 Long Apr. '82 contracts were canceled and replaced by 20 Long Dec. '81 contracts. As a consequence of this switch, a trading "loss" of $104,800 was purportedly realized in 1980 on the cancellation of the 20 Long Apr. '82, but the spread was immediately reconstituted as a 2-month bear spread of 20 Long Dec. '81 and 20 Short Feb. '82

For Ewing, Hunter elected to conduct futures trading in "very thin markets." That is, the delivery months in the contracts selected were so distant on the date of purchase that trading in them at that time was relatively inactive. This is illustrated by the original bull spread where the near leg of the spread was 14 months away from the initial trade date, December 5, 1980, and the distant leg was 16 months away. After the switch from the bull spread to the bear spread, the near and distant legs were, respectively, 12 and 14 months away.

On February 11, 1981, Ewing executed another switch by canceling 10 of his Dec. '81 Long contracts (acquired on December 10, 1980) and acquiring 10 Apr. '82 Long contracts. Consequently, at the close of trading on February 11, 1981, Ewing's position in the market amounted to a butterfly spread as follows:

10 Long Dec. '81             10 Long Apr. '82
              20 Short Feb. '82

During the remainder of 1981, Hunter executed a series of transactions for Ewing, which altered his position from a butterfly spread to a bear spread and back again to a butterfly spread.

As a result of his futures transactions, Ewing claimed ordinary losses of $107,563 and $116,096 in 1980 and 1981, respectively, comprised of the following:

|                    | *1980*   | *1981*   |
|--------------------|----------|----------|
| Trading losses     | $104,800 | $114,900 |
| Commissions        | 1,000    | 500      |
| Cancellation fees  | 1,763    | 696      |
| Total              | 107,563  | 116,096  |

Substantially all of the short contracts were liquidated at gains via "assignments" during 1981 after having been held a minimum of 6 months and were reported by Ewing as long-term capital gains on his 1981 return.

## Toll and Leavitt and Their Participation

Arthur Toll (Toll) received a bachelor of arts degree in 1948 and a law degree in 1950 from Case Western Reserve University in Cleveland, Ohio. He has practiced corporate securities law since 1961 and has maintained an active securities account with Shearson American Express since 1977. Richard B. Leavitt (Leavitt) graduated from Dartmouth College in 1957 with a bachelor of arts degree and received a law degree from Stanford University in 1960. He has actively invested in securities since 1960.

At all relevant times, Toll and Leavitt were principals in the law firm of Toll & Leavitt. They were also limited partners in a partnership known as C.D. Associates (C.D.) and conducted their transactions with Hunter through C.D.

C.D. was organized as a California limited partnership on or about June 14, 1980, for the exclusive purpose of trading in commodity futures. Its general partner was H & S Investments (H & S), a general partnership. At all relevant times, H & S Investments was a partnership comprised of Mr. and Mrs. Bruce I. Hochman, Mr. and Mrs. Avram Salkin, and certain revocable living trusts of which these individuals were the trustees and beneficiaries. On or about December 3, 1980, H & S was licensed by the CFTC as a Commodity Operator and as a Commodity Trading Advisor. C.D.'s operations and trading activities were managed by Salkin with some indirect involvement by Bruce Hochman.

Prior to the formation of C.D., Salkin invited some of the clients of his firm to a meeting where he disclosed, discussed, and explained a contemplated investment program in gold futures. Toll and Leavitt attended the meeting and ultimately decided to participate in the program

because they knew and respected Salkin, relied upon his opinion, and had dealt with his law firm for over 10 years. At the meeting, they were informed by Salkin that there would be "good tax treatment" with respect to an investment as limited partners in C.D., the partnership which was being formed to handle the contemplated transactions in gold futures. Toll and Leavitt each invested $37,500 in C.D. and became limited partners therein on June 19, 1980.

The details of C.D.'s transactions in gold futures are set out in Appendix II, and only a brief synopsis will be provided here. On June 18, 1980, Salkin initiated for C.D. a series of straddle trades in gold futures that continued into 1981. Throughout the series of transactions made during 1980, Salkin maintained a substantially balanced position, i.e., an equal number of long contracts and short contracts, plus a few extra short contracts over and above the long contracts. This practice is illustrated by C.D.'s position in the market on June 18, 1980 which was essentially that of a 6-month bull spread, i.e., 175 Short Oct. '81 contracts balanced against 175 Long Apr. '82 contracts, with an extra 9 Oct. '81 Short contracts. Salkin's stated purpose for the additional 9 short contracts over long contracts was an attempt to neutralize the gain or loss from changes in gold prices, and to limit the gain or loss in the position to fluctuations in interest rates. In other words, it was an attempt to prevent, as nearly as possible, the market forces from having any impact upon C.D.'s position.

On June 30, 1980, Salkin liquidated by cancellation with Hunter a number of C.D.'s short positions for one delivery month and purchased a nearly equivalent number of short positions for a different delivery month. These switches were made in order to realize tax losses for 1980. After the switches, C.D.'s account still constituted a bull spread but the legs of the spread were placed closer together, i.e., the initial 6-month spread was replaced with a 2-month spread. In economic terms, all that the switching accomplished for C.D. was to incur additional transaction costs (commissions and cancellation fees) since the reconstituted bull spread actually offered a lower profit potential than the preceding spread. Substantially all of C.D.'s profitable contract positions were held a minimum of 6 months before liquidation

via "assignment" in 1981 in order to acquire long-term treatment for the gains.

C.D.'s partnership return for 1980 was prepared in accordance with the partnership's books and records with professional assistance from Salkin concerning the reporting and treatment of the partnership's transactions in gold futures. The partnership reported an ordinary loss in 1980 comprised of the following:

| | |
|---|---:|
| Trading losses | $3,063,316 |
| Commissions | 15,541 |
| Cancellation fees | 13,925 |
| Total losses | 3,092,782 |

Toll and Leavitt each reported an ordinary loss in 1980 in the amount of $103,835 as their distributive shares of C.D.'s losses.

### Czarneski and Leong and Their Participation

Don A. Czarneski (Czarneski) graduated from Memphis State University in 1966 with a bachelor of science degree in business administration. From 1966 through 1980, he was employed at different times by Union Camp Corp., Weyerhaeuser Corp., Paragon Securities, AS Hart Securities, and Coldwell Banker. At the time of trial, he was an associate vice president in Coldwell Banker's Commercial Real Estate Division in Houston, Texas.

Richard W. Leong (Leong) graduated from Linfield College in McMinnville, Oregon, in 1942. He was a certified and practicing orthopedic surgeon from 1953 up to and throughout the years in issue.

On June 30, 1980, Czarneski and Leong through Hunter initiated a series of independent butterfly straddle trades in gold futures similar to those entered into by Ewing. Throughout the series of straddle trades, Czarneski and Leong both maintained balanced positions. The details and chronology of Czarneski's and Leong's futures transactions for the taxable years 1980 and 1981 are more thoroughly set forth in Appendix III and Appendix IV, respectively. Cancellations were utilized in both of their trading accounts during 1980 and 1981 in order to realize purported tax losses in the losing legs of their straddles, and switches were employed to offset and protect their profitable posi-

tions in the other legs of their straddles for a minimum of 6 months when the purported positions were liquidated via assignments.

On their returns for the taxable years 1980 and 1981, Czarneski and Leong claimed deductions for the following ordinary losses:

|           | 1980      | 1981      |
|-----------|-----------|-----------|
| Czarneski | $227,400  | $359,600  |
| Leong     | 35,000    | 198,200   |

In addition to the above losses for 1981, Czarneski claimed a deduction of $3,000 and Leong a deduction of $2,500 for "investment advisory services" paid to Hunter in connection with their futures trading. In 1981, they reported long-term capital gains of $586,700 and $234,500, respectively, from the assignment of gold futures contracts.

OPINION

(1) *Losses on Straddle Transactions*

The primary issue in these cases is whether petitioners, investors as opposed to dealers, are entitled to deduct losses on straddle transactions as claimed on their income tax returns for 1980 and 1981. Resolution of the issue turns on the effect of section 108 of the Tax Reform Act of 1984 (Division A of the Deficit Reduction Act of 1984), Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817. Hereinafter, our references to "section 108" are to the Tax Reform Act of 1984, as amended, unless otherwise stated.

By notices of deficiency, respondent determined that petitioners' straddle losses are not deductible under section 165(c)(2) because the transactions were not entered into for profit. Relying on the primarily for-profit test applied in our decisions in *Fox v. Commissioner*, 82 T.C. 1001 (1984), and *Smith v. Commissioner*, 78 T.C. 350 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987), respondent argues that petitioners did not enter into the straddle transactions primarily for profit, but instead their primary motive was to obtain tax benefits. Respondent does not argue and we have not found that these transactions are

"shams in substance" (see *Glass v. Commissioner,* 87 T.C. 1087 (1986)), or that they are "factual shams" (see *Brown v. Commissioner,* 85 T.C. 968 (1985)), affd. sub nom. *Sochin v. Commissioner,* 843 F.2d 351 (9th Cir. 1988).

Petitioners, on the other hand, submit that their dealings in gold futures were bona fide transactions entered into for profit and, therefore, their losses are deductible under section 165(c)(2). They argue that the profit standard of former section 108 as set forth in our decision in *Miller v. Commissioner,* 84 T.C. 827 (1985), revd. 836 F.2d 1274 (10th Cir. 1988), applies to their transactions, and that they have carried their burden of proving that the transactions were entered into with a reasonable expectation of profit. It should be noted that these cases were tried and originally briefed before section 108 was amended by section 1808(d) of the Tax Reform Act of 1986. However, at our request, the parties filed supplemental briefs after section 108 was amended but before *Miller v. Commissioner,* 84 T.C. 827 (1985), was reversed by the 10th Circuit, 836 F.2d 1274 (10th Cir. 1988).

In *Miller,* we construed the original version of section 108[5] and concluded that Congress did not intend to adopt the historical subjective test of section 165(c)(2), i.e., primary motivation, for purposes of determining pre-1982 straddle loss deductions. Persuaded in part by the legislative history of former section 108, we adopted in *Miller* an objective profit standard which could be satisfied with a showing that at the time the transaction was entered into

---

[5]The original version of sec. 108 provided, in pertinent part:

SEC. 108(a). GENERAL RULE.— For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—
    (1) which were entered into before 1982 and form part of a straddle, and
    (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.
    (b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.
    (c) NET LOSS ALLOWED WHETHER OR NOT TRANSACTION ENTERED INTO FOR PROFIT.—If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle. [Tax Reform Act of 1984, Pub. L. 98-369, sec. 108, 98 Stat. 630.]

there was a reasonable expectation of profit. 84 T.C. at 838-842. Following the lead of our decision in *Miller*, the Ninth Circuit subsequently concluded that former section 108 required the investor to have only a reasonable expectation of a profit. *Wehrly v. United States*, 808 F.2d 1311, 1312 (9th Cir. 1986); accord *Landreth v. Commissioner*, 845 F.2d 828 (9th Cir. 1988), affg. a Memorandum Opinion of this Court. However, in *Miller v. Commissioner*, 836 F.2d 1274 (10th Cir. 1988), the Tenth Circuit rejected our reasonable expectation of a profit test and concluded that the proper test was the primary motive of the taxpayer upon entering into the transaction.

To further complicate the situation, after our opinion in *Miller* was released but before it was reversed by the Tenth Circuit, former section 108 was amended retroactively by section 1808(d) of the Tax Reform Act of 1986.[6] By the amendment, Congress obviously attempted to harmonize the language of section 108 with that in section 165(c)(2). See *Glass v. Commissioner*, 87 T.C. 1087, 1167 (1986). Consequently, upon further consideration we have recently concluded that the phrase "transaction entered into for profit" as used in amended section 108 is to be interpreted by reference to the subjective primary purpose standard historically applied to losses arising under section 165(c)(2). *Boswell v. Commissioner*, 91 T.C. 151 (1988).

Thus, with the exception of Toll and Leavitt, petitioners in these cases must show that their primary purpose for entering into the straddle transactions was for profit. Since Toll and Leavitt were limited partners in C.D., the deductibility of their losses from the straddle transactions has to be determined at the partnership level. See *Brannen v.*

---

[6]Sec. 1808(d) of the Tax Reform Act of 1986 amended sec. 108 as follows:

(d) SECTION 108.—Section 108 of the tax reform act of 1984 is amended—

(1) by striking out "if such position is part of a transaction entered into for profit" and inserting in lieu thereof "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business",

(2) by striking out subsection (b) and inserting in lieu thereof the following:

"(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.",

(3) by striking out the heading for subsection (c) and inserting in lieu thereof the following: "(c) NET LOSS ALLOWED.—", * * *

[Sec. 1808(d), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817.]

*Commissioner*, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982). Therefore, the proper focus with respect to their losses is on the intent of the general partners of C.D., Salkin, and Hochman. See *Resnick v. Commissioner*, 66 T.C. 74 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977).

As stated in *Glass*, the effect of adopting the test applicable to section 165(c)(2) for purposes of section 108 is to revalidate the historical profit standard set forth in *Fox v. Commissioner*, 82 T.C. 1001 (1984), and *Smith v. Commissioner*, 78 T.C. 350 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). Consequently, it is to *Fox* and *Smith* that we turn for guidance in the cases before us even though an appeal in docket numbers 3896-84, 13442-84, and 13443-84 would be to the Court of Appeals for the Ninth Circuit, the author of the decisions to the contrary in *Wehrly v. United States, supra*, and *Landreth v. Commissioner, supra*, because both *Wehrly* and *Landreth* arose under section 108 before it was amended. *Golsen v. Commissioner*, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Furthermore, the precedential value of *Wehrly* and *Landreth* is seriously reduced, if not eliminated, by the statements of the panel in *Landreth* that "we believe that Congress, in enacting the 1986 amendments to section 108, clearly intended to overrule the Tax Court in *Miller* and to clarify that the 'entered into for profit' language in section 108 should be interpreted in the same way as the identical language in section 165(c)(2)—namely as allowing taxpayers to deduct losses from straddle transactions only if they can show that their primary motive for entering into the transactions was economic profit" and that "all members of this panel believe that *Wehrly* was incorrectly decided."

In *Fox*, we concluded that section 165(c)(2) requires that profit be the primary motive if a loss from a particular straddle transaction is to be deductible. 82 T.C. at 1021. We acknowledged that profit need not be the sole motive, but emphasized that a mere incidental profit motive would not be sufficient. 82 T.C. at 1018, citing *Ewing v. Commissioner*, 20 T.C. 216, 233 (1953), affd. 213 F.2d 438 (2d Cir. 1954). In determining whether a straddle transaction is

entered into primarily for profit, *Fox* provides the following additional guidelines:

(1) The ultimate issue is profit motive and not profit potential. However, profit potential is a relevant factor to be considered in determining profit motive. 82 T.C. at 1021.

(2) Profit motive refers to economic profit independent of tax savings. 82 T.C. at 1022.

(3) The determination of profit motive must be made with reference to the spread positions of the straddle and not merely to the losing legs, since it is the overall scheme which determines the deductibility or nondeductibility of the loss. 82 T.C. at 1018, citing *Smith v. Commissioner,* 78 T.C. at 390-391.

(4) If there are two or more motives, it must be determined which is primary, or of first importance. The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent. 82 T.C. at 1022.

(5) Because the statute speaks of motive in "entering" a transaction, the main focus must be at the time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent. 82 T.C. at 1022.

In the cases before us, as in *Fox,* we proceed on the supposition without so finding that petitioners had a sincere belief that there was a possibility of making some profit from their transactions and were attracted to the transactions by this prospect as well as by the favorable tax benefits. We must determine, however, which of these motives was primary, or of first importance, with the burden of proof being on petitioners. Rule 142.

From the record as a whole, we are convinced that petitioners did not enter into their straddle transactions primarily for profit for the reasons discussed below.

First, the principal thrust of Hunter's promotional material was the availability of the closing procedures by cancellation and assignment and the favorable income tax consequences allegedly associated with such procedures. This is particularly apparent from Salkin's 23-page tax opinion, which is the most influential item in the promotional materials, and the item which all petitioners admit-

tedly read. In contrast to the favorable tax benefits, the profitability of the program was not seriously discussed or quantified.

Second, the trading by or for petitioners demonstrates more interest in the tax advantages purportedly made available by the alternative closing procedures than in profits. This is clear from our finding that petitioners frequently held positions during the years in issue which tended to minimize rather than to maximize profits. For example, petitioners maintained spread positions in "thin markets" with low volume trading and where the temporal difference between delivery months was so close as to leave virtually no time for market movements in gold prices or short-term interest rates to affect net profits. Furthermore, each petitioner chose to "cancel" the initial losing legs of his straddles before the close of the 1980 tax year so as to generate an ordinary loss. In the following year, substantially all of the profitable legs of the straddles were assigned in order to generate long-term gains. As a consequence, petitioners were able to offset their 1980 ordinary income from wages, dividends, interest, rents, and partnerships with ordinary losses from the cancellation of their gold futures transactions. By closing out the profitable legs of their straddle positions in 1981 by means of the assignments, petitioners not only deferred their straddle gains to 1981 but also effectively converted 1980 ordinary income into 1981 long-term capital gains.

Third, the so-called "alternative liquidation techniques," (i.e., cancellations and assignments) described hereinbefore were devised and adopted by Hochman, Salkin & DeRoy as part of a program to assist Hunter to sell prospective investors on a scheme to achieve tax avoidance. However, to utilize these techniques, petitioners paid more commissions, and fees than they would have incurred if their positions had been closed in the usual manner. Petitioners were willing to incur the extra cost, however, in order to obtain the beneficial tax consequences as illustrated by Ewing's testimony as follows:

There was a tax consequence to the way in which you got out of your positions. One of the consequences is that if it's a losing position it could have been cancelled  * * *  or liquidated at a greater cost than if you

offset, but it had some tax advantages—which were openly stated up front. * * *

Fourth, the transactions were entered into for the specific purpose of generating tax losses as revealed in the following excerpt from Salkin's testimony:

Q. Okay. Mr. Salkin, prior to June 18—prior to the time that the first trade in the C.D. Account was ever made, wasn't it contemplated that you would switch certain—certain of the losing legs of the gold futures spreads to achieve a loss to this—close to this amount?

A. No, there was no specific target, and there were no specific contracts that were earmarked for trading.

Q. Did you have a specific idea of a tax loss that you wanted as a result of these trades?

A. Yes.

Q. How much was that? What was it?

A. Approximately double the amount of capital.

             *      *      *      *      *      *      *

Q. For what purpose?

A. That—That was my general target, a—that I had the profit target of 20 percent per annum, and I had a tax loss target the first year of approximately double the capital.

This testimony by Salkin, one of the principal organizers of Hunter, a general partner in C.D., and the individual primarily responsible for placing all petitioners in the program is particularly telling as to their intent. Furthermore, under the circumstances, we find it impossible to believe that Salkin did not discuss these loss targets with each petitioner.

From all of the above, we are satisfied that petitioners' motives in entering into these transactions, despite their protestations to the contrary, were primarily to obtain tax advantages and not for profits. In reaching this conclusion, we are cognizant of the fact that tax planning is an economic reality in the business world and the effect of tax laws on a transaction is routinely considered along with other factors, but nevertheless we reiterate that "tax straddling * * * transactions can hardly be said to number among congressionally approved, sanctioned, or encouraged responses to the tax laws." *Fox v. Commissioner,* 82 T.C. 1001, 1025 (1984).

Since petitioners' transactions were not entered into primarily for profit, their straddle loss deductions are not

allowable under section 165(c)(2) and section 108(a). However, section 108(c) provides that:

> If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle. [Tax Reform Act of 1984, Pub. L. 98-369, sec. 108, 98 Stat. 630, as amended by sec. 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817.]

Section 1.165-13T, Temporary Income Tax Regs., 49 Fed. Reg. 33445 (Aug. 23, 1984) further amplifies section 108(c) to provide, in pertinent part:

> Q-3. If a loss is disallowed in a taxable year (year 1) because the transaction was not entered into for profit, is the entire gain from the straddle occurring in a later taxable year taxed?
>
> A-3. No. Under section 108(c) of the Act the taxpayer is allowed to offset the gain in the subsequent taxable year by the amount of loss (including expenses) disallowed in year 1.

In each of these cases, the petitioner claimed loss deductions in 1980 (year 1) with respect to a straddle position or positions, but in 1981 (year 2) reported long-term capital gains from the straddle transactions. Petitioners, therefore, are entitled to offset their gains in 1981 by any losses that are not allowable in 1980 under section 108(a). Sec. 108(c); sec. 1.165-13T, Q & A-3, Temporary Income Tax Regs.; cf. *Glass v. Commissioner*, 87 T.C. 1087, 1177 (1986), where the straddle transactions were a sham and gains reported in year two were held not to constitute taxable income.

(2) *Fees Paid With Respect to Straddles*

Inasmuch as we have found that petitioners entered into their straddle transactions primarily to obtain tax deductions, the fees paid by petitioners constituted payments to purchase such deductions and are nondeductible personal expenditures. *Brown v. Commissioner*, 85 T.C. 968 (1985), affd. sub nom. *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988); *Zmuda v. Commissioner*, 79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); *Houchins v. Commissioner*,

79 T.C. 570 (1982). See also *Falsetti v. Commissioner,* 85 T.C. 332 (1985).

(3) *Additions to Tax*

In amended answers, respondent seeks increased interest from each petitioner pursuant to section 6621(c). Respondent has the burden of proof with respect to the additional interest. *Zirker v. Commissioner,* 87 T.C. 970, 981 (1986). Rule 142(a).

The increased interest provided by section 6621(c) is properly asserted where respondent has established that there is a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax motivated transactions." The additional interest accrues after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). *Solowiejczyk v. Commissioner,* 85 T.C. 552, 555-557 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986); *Neely v. Commissioner,* 85 T.C. 934 (1986). Petitioners request that we reconsider our conclusion in *Neely* and *Solowiejczyk* and hold that section 6621(c) applies only with respect to returns filed after enactment of the Tax Reform Act of 1984. However, this argument was specifically addressed and rejected in *Solowiejczyk* and will not be reconsidered here.

Section 6621(c)(3)(A)(iii) specifically includes any straddle as a tax-motivated transaction. Thus, petitioners' transactions are clearly within the purview of section 6621(c). Moreover, section 6621(c)(3)(B) gives the Secretary of the Treasury authority, by regulation, to add to the categories of transactions that under section 6621(c) will be treated as tax-motivated transactions. Under that grant of authority the Secretary has promulgated section 301.6621-2T, Temporary Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50391 (Dec. 28, 1984), 1985-1 C.B. 368, which includes in tax-motivated transactions any underpayment attributable to a deduction disallowed under section 165(c)(2). Sec. 301.6621-2T, Q & A-4, Temporary Proced. & Admin. Regs. We have previously used this regulation as a guide in similar situations. See, e.g., *Patin v. Commissioner,* 88 T.C. 1086, 1129 (1987); *Helba v. Commissioner,* 87 T.C. 983, 1015

(1986); *Stanley Works and Subsidiaries v. Commissioner,* 87 T.C. 389, 420-421 (1986).

We have found that petitioners' straddle transactions were not entered into for profit. Consequently, any underpayment of tax by any petitioner which is based on a claimed straddle loss is attributable to a tax-motivated transaction and subject to the additional interest provided by section 6621(c). Sec. 6621(c)(3)(A)(iii); sec. 6621(c)(3)(B); sec. 301.6621-2T, Q & A-4, Temporary Proced. & Admin. Regs.

In his statutory notices, respondent determined that additions to tax are due from petitioners Ewing, Leong, and Czarneski for negligence under section 6653(a)(1), or where applicable, section 6653(a)(2). Respondent also determined that additions to tax are due from petitioners Leong and Czarneski for that portion of their underpayments which is attributable to negligence under section 6653(a)(2) for 1981. Petitioners have the burden of proof with respect to these determinations. *Welch v. Helvering,* 290 U.S. 111 (1933). Rule 142(a).

In amended answers, respondent asserted that petitioners Toll and Leavitt are also liable for additions to tax for negligence under section 6653(a)(1) and that Ewing is liable for an addition to tax on that portion of his underpayment which is attributable to negligence under section 6653(a)(2). Respondent has the burden of proof with respect to the additions to tax asserted in the amended answers. Rule 142(a).

Before entering into the Hunter program, all petitioners read and relied upon a tax opinion provided by the law firm. Furthermore, at least two of them, Toll and Leavitt, had known and successfully dealt with Salkin, the author of the opinion, for over 10 years. Under the circumstances of this record, petitioners' reliance in good faith on the attorneys to formulate and implement the plan was not unreasonable or negligent. See *Sammons v. Commissioner,* 838 F.2d 330 (9th Cir. 1988), affg. in part and revg. in part a Memorandum Opinion of this Court.

We conclude, therefore, that petitioners' underpayments of tax were not due to negligence or intentional disregard of

rules and regulations, and the additions to tax under section 6653(a)(1) and 6653(a)(2) are not sustained.

(4) *Damages Under Section 6673*

At the conclusion of trial, respondent moved for an award of damages under section 6673 against each petitioner for instituting and maintaining a proceeding before the Tax Court primarily for delay or which was based upon frivolous or groundless positions. We are well aware that transactions involving commodity straddles are extremely complicated and, during the years under consideration, were relatively new. Furthermore, from the time the petitions were filed in these cases up to and for some time after the date of trial, the law with respect to tax straddles was uncertain. See *Miller v. Commissioner*, 84 T.C. 827 (1985), revd. 836 F.2d 1274 (10th Cir. 1988); *Forseth v. Commissioner*, 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. *Mahoney v. Commissioner*, 808 F.2d 1219 (6th Cir. 1987), affd. *Bramblett v. Commissioner*, 810 F.2d 197 (5th Cir. 1987), affd. *Enrici v. Commissioner*, 813 F. 2d 293 (9th Cir. 1987), affd. *Wooldridge v. Commissioner*, 800 F.2d 266 (11th Cir. 1986); and *Julien v. Commissioner*, 82 T.C. 492 (1984). Consequently, and in the exercise of our discretion, we decline to award damages under section 6673.

To reflect the foregoing, and the concessions made by the parties,

*Decisions will be entered under Rule 155.*

## APPENDIX I

### PHILIP M. EWING
#### 1980-1982 Gold Futures Transactions
#### (Gold = 100 Troy Ounces)
#### F. G. Hunter Program

ACCOUNT No. 11106

| | Date | Position | Delivery date | Contract No. | Quantity | Price | Classes (line) | Cancellation/ assignment fee | Commission | Method of disposition | Recognized gain or (loss) | Total amt. claimed (per return) and character |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **1980** | | | | | | | | | | | |
| 1. | 12/05 | Long | Apr. '82 | 2011 | 20 | $757.50 | — | — | $1,000 | | | |
| 2. | 12/05 | Short | Feb. '82 | 2012 | 20 | 739.20 | — | — | 1,000 | | ($104,800) | ($107,563.00) OL |
| 3. | 12/10 | Short | Apr. '82 | 2011 | 20 | 705.10 | 1 | $1,762.75 | 1,000 | Canceled | | |
| 4. | 12/10 | Long | Dec. '81 | 2200 | 20 | 671.60 | — | | | Canceled | ($104,800) | ($107,563.00) OL |
| | **1981** | | | | | | | | | | | |
| 5. | 02/11 | Long | Apr. '82 | 2972 | 10 | 583.00 | — | | 500 | | | |
| 6. | 02/11 | Short | Dec. '81 | 2200 | 10 | 556.70 | 4 | 695.88 | | Canceled | (114,900) | (116,095.88) OL |
| 7. | 02/26 | Long | Oct. '81 | 3099 | 10 | 535.00 | — | | 500 | | | |
| 8. | 02/26 | Short | Apr. '82 | 2972 | 10 | 573.70 | 5 | | 100 | Offset | (9,300) | (9,900.00) STCL |
| 9. | 03/19 | Long | Oct. '81 | 3148 | 10 | 539.90 | — | | 500 | | | |
| 10. | 03/19 | Short | Dec. '81 | 2200 | 10 | 551.00 | 4 | | 100 | Offset | (120,600) | (121,200.00) STCL |
| 11. | 04/07 | Long | June '82 | 3204 | 10 | 598.70 | — | | 500 | Offset | | |
| 12. | 04/07 | Short | Oct. '81 | 3148 | 10 | 545.00 | 9 | | 100 | | 5,100 | 4,500.00 STCG |
| 13. | 06/11 | Long | Feb. '82 | 2012 | 5 | 509.40 | 2 | — | 50 | Assigned | 114,900 | 114,600.00 LTCG |
| 14. | 06/11 | Long | Feb. '82 | 2012 | 5 | 511.34 | 2 | — | 50 | Assigned | 113,925 | 113,675.00 LTCG |
| 15. | 06/11 | Short | June '82 | 3204 | 5 | 533.50 | 11 | | 50 | Offset | (32,600) | (32,900.00) STCL |
| 16. | 06/11 | Short | Oct. '81 | 3099 | 5 | 487.20 | 7 | | 50 | Offset | (23,900) | (24,200.00) STCL |
| 17. | 07/20 | Long | Dec. '81 | 3797 | 5 | 436.70 | — | | 250 | Offset | | |
| 18. | 07/20 | Short | June '82. | 3204 | 5 | 468.50 | 11 | | 50 | | (65,100) | (65,400.00) STCL |
| 19. | 09/23 | Long | Feb. '82 | 2012 | 5 | 482.85 | 2 | — | | Assigned | 128,175 | 127,925.00 LTCG |
| 20. | 09/23 | Short | Oct. '81 | 3099 | 5 | 458.00 | 7 | | 50 | Offset | (38,500) | (38,800.00) LTCL |
| 21. | 10/15 | Long | Apr. '82 | 3733 | 5 | 471.00 | — | | 250 | Marked/Mkt. | (30,300) 60/40 | (30,550.00) 60/40 |
| 22. | 10/15 | Short | Dec. '81 | 3797 | 5 | 447.90 | 17 | | 50 | Offset | 5,600 60/40 | 5,300.00 60/40 |
| | **1982** | | | | | | | | | | | |
| 23. | 01/04 | Short | Apr. '82 | 3733 | 5 | 403.00 | 21 | — | 50 | Offset | (34,000) 60/40 | (34,300.00) 60/40 |
| 24. | 01/04 | Long | Feb. '82 | 2012 | 5 | 395.95 | 2 | | | Assigned | 171,625 | 171,375.00 LTCG |

PHILIP/MARIAN EWING

| Month and year of contract | Long/ short | Number of contracts | Acquisition date | Commission paid on acquisition | Contract price | Disposition date | Disposition price | Fees paid in conjunction with disposition | Gain (loss) before transaction costs | Transaction costs | Net gain (loss) | Character of disposition claimed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr. '82 | B | 20 | 12/05/80 | $1,000 | $757.50 | 12/10/80 | $705.10 | $1,762.75 | -($104,800) | $2,762.75 | ($107,562.75) | Cancellation |
| Feb. '82 | S | 5 | 12/05/80 | 250 | 739.20 | 06/11/81 | 509.40 | 50.00 | 114,900 | 300.00 | 114,600.00 | Offset |
| Feb. '82 | S | 5 | 12/05/80 | 250 | 739.20 | 01/04/82 | 395.95 | 0 | 171,625 | 250.00 | 171,375.00 | Assignment |
| Feb. '82 | S | 5 | 12/05/80 | 250 | 739.20 | 06/11/81 | 511.35 | 0 | 113,925 | 250.00 | 113,675.00 | Assignment |
| Feb. '82 | S | 5 | 12/05/80 | 250 | 739.20 | 09/23/81 | 482.85 | 0 | 128,175 | 250.00 | 127,925.00 | Assignment |
| Dec. '81 | B | 10 | 12/10/80 | 500 | 671.60 | 02/11/81 | 556.70 | 695.88 | (114,900) | 1,195.88 | (116,095.88) | Cancellation |
| Dec. '81 | B | 10 | 12/10/80 | 500 | 671.60 | 03/19/81 | 551.00 | 100.00 | (120,600) | 600.00 | (121,200.00) | Offset |
| Apr. '82 | B | 10 | 02/11/81 | 500 | 588.00 | 02/26/81 | 573.70 | 100.00 | (9,300) | 600.00 | (9,900.00) | Offset |
| Oct. '81 | B | 5 | 02/26/81 | 250 | 535.00 | 06/11/81 | 487.20 | 50.00 | (23,900) | 300.00 | (24,200.00) | Offset |
| Oct. '81 | B | 5 | 02/26/81 | 250 | 535.00 | 09/23/81 | 458.00 | 50.00 | (38,500) | 300.00 | (38,800.00) | Offset |
| Oct. '81 | B | 10 | 03/19/81 | 500 | 539.90 | 04/07/81 | 545.00 | 100.00 | 5,100 | 600.00 | 4,500.00 | Offset |
| Jun. '82 | B | 5 | 04/07/81 | 250 | 598.70 | 06/11/81 | 533.50 | 50.00 | (32,600) | 300.00 | (32,900.00) | Offset |
| Jun. '82 | B | 5 | 04/07/81 | 250 | 598.70 | 07/20/81 | 468.50 | 50.00 | (65,100) | 300.00 | (65,400.00) | Offset |
| Dec. '81 | B | 5 | 07/20/81 | 250 | 486.70 | 10/15/81 | 447.90 | 50.00 | 5,600 | 300.00 | 5,300.00 | Offset |
| Apr. '82 | B | 5 | 10/15/81 | 250 | 471.00 | 01/04/82 | 403.00 | 50.00 | (34,000) | 300.00 | (34,300.00) | Offset |

## APPENDIX II

### C. D. ASSOCIATES
### 1980 GOLD FUTURES TRANSACTIONS
### (Gold = 100 Troy Ounces)
### F. G. HUNTER PROGRAM

ACCOUNT No. 71111

| | Date 1980 | Position | Delivery date | Contract No. | Quantity | Price | Closes (line) | Cancellation/ assignment fee | Commission | Method of disposition | Recognized gain or (loss) | Total amt. claimed (per return) and character |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 06/18 | Long | Apr. '82 | 1026 | 175 | $708.00 | --- | | $4,375 | | | |
| 2. | 06/18 | Short | Oct. '81 | 1027 | 175 | 674.00 | --- | | 4,375 | | | |
| 3. | 06/18 | Short | Oct. '81 | 1028 | 9 | 674.00 | --- | | 297 | | | |
| 4. | 06/19 | Long | Apr. '82 | 1031 | 100 | 717.00 | --- | | 2,500 | | | |
| 5. | 06/19 | Long | Apr. '82 | 1033 | 40 | 717.00 | --- | | 1,000 | | | |
| 6. | 06/19 | Short | Oct. '81 | 1032 | 100 | 683.00 | --- | | 2,500 | | | |
| 7. | 06/19 | Short | Oct. '81 | 1034 | 40 | 683.20 | --- | | 1,000 | | | |
| 8. | 06/19 | Short | Oct. '81 | 1035 | 7 | 681.00 | --- | | 231 | | | |
| 9. | 06/25 | Long | Apr. '82 | 1185 | 80 | 747.00 | --- | | 2,000 | | | |
| 10. | 06/25 | Long | Apr. '82 | 1186 | 40 | 753.00 | --- | | 1,000 | | | |
| 11. | 06/25 | Long | Apr. '82 | 1187 | 100 | 755.00 | --- | | 2,500 | | | |
| 12. | 06/25 | Short | Oct. '81 | 1178 | 40 | 715.00 | --- | | 1,000 | | | |
| 13. | 06/25 | Short | Dec. '81 | 1180 | 100 | 730.00 | --- | | 3,300 | | | |
| 14. | 06/25 | Short | Oct. '81 | 1179 | 1 | 715.00 | --- | | 33 | | | |
| 15. | 06/25 | Short | Dec. '81 | 1181 | 2 | 725.00 | --- | | 66 | | | |
| 16. | 06/25 | Short | Dec. '81 | 1206 | 3 | 725.00 | --- | | 99 | | | |
| 17. | 06/25 | Short | Feb. '82 | 1184 | 80 | 734.00 | --- | | 2,000 | | | |
| 18. | 06/25 | Short | Feb. '82 | 1183 | 100 | 742.20 | --- | | 2,500 | | | |
| 19. | 06/25 | Short | Feb. '82 | 1182 | 3 | 738.00 | --- | | 99 | | | |
| 20. | 06/25 | Long | Oct. '82 | 1027 | 100 | 718.00 | 2 | $2,500 | 250 | Canceled | ($440,000) | ($445,000) OL |
| 21. | 06/25 | Long | Oct. '81 | 1028 | 5 | 714.00 | 3 | 125 | 250 | Canceled | (20,000) | (20,290) OL |
| 22. | 06/26 | Long | Apr. '82 | 1064 | 10 | 756.90 | --- | | | | | |
| 23. | 06/26 | Short | Feb. '82 | 1065 | 10 | 744.00 | --- | | | | | |
| 24. | 06/26 | Long | Dec. '81 | 1181 | 2 | 732.50 | 15 | 50 | | Canceled | (1,500) | (1,616) OL |

APPENDIX II—Continued

| | Date 1980 | Position | Delivery date | Contract No. | Quantity | Price | Closes (line) | Cancellation/ assignment fee | Commission | Method of disposition | Recognized gain or (loss) | Total amt. claimed (per return) and character |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25. | 06/30 | Long | Apr. '82 | 1196 | 50 | $785.50 | --- | | $1,250 | | | |
| 26. | 06/30 | Long | Apr. '82 | 1197 | 100 | 788.50 | --- | | 2,500 | | | |
| 27. | 06/30 | Long | Apr. '82 | 1198 | 35 | 792.00 | --- | | 875 | | | |
| 28. | 06/30 | Short | Feb. '82 | 1195 | 50 | 771.00 | --- | | 1,250 | | | |
| 29. | 06/30 | Short | Feb. '82 | 1194 | 100 | 773.00 | --- | | 3,300 | | | |
| 30. | 06/30 | Short | Feb. '82 | 1193 | 100 | 774.00 | --- | | 2,500 | | | |
| 31. | 06/30 | Short | Feb. '82 | 1192 | 35 | 777.60 | --- | | 875 | | | |
| 32. | 06/30 | Short | Feb. '82 | 1190 | 252 | 784.00 | --- | | 8,316 | | | |
| 33. | 06/30 | Short | Feb. '82 | 1191 | 3 | 784.00 | --- | | 99 | | | |
| 34. | 06/30 | Short | Feb. '82 | 1189 | 6 | 781.00 | --- | | 198 | | | |
| 35. | 06/30 | Short | Feb. '82 | 1188 | 3 | 784.00 | --- | | 99 | | | |
| 36. | 06/30 | Long | Oct. '81 | 1027 | 15 | 755.50 | 2 | $375 | | Canceled | ($122,250) | ($123,000) OL |
| 37. | 06/30 | Long | Oct. '81 | 1027 | 25 | 755.60 | 2 | 625 | | Canceled | (204,000) | (205,250) OL |
| 38. | 06/30 | Long | Oct. '81 | 1027 | 35 | 756.00 | 2 | 875 | | Canceled | (287,000) | (288,750) OL |
| 39. | 06/30 | Long | Oct. '81 | 1028 | 4 | 756.00 | 3 | 100 | | Canceled | (32,800) | (33,032) OL |
| 40. | 06/30 | Long | Oct. '81 | 1032 | 100 | 756.00 | 6 | 2,500 | | Canceled | (730,000) | (735,000) OL |
| 41. | 06/30 | Long | Oct. '81 | 1034 | 40 | 756.00 | 7 | 1,000 | | Canceled | (291,800) | (295,800) OL |
| 42. | 06/30 | Long | Oct. '81 | 1035 | 7 | 755.00 | 8 | 175 | | Canceled | (51,800) | (52,206) OL |
| 43. | 06/30 | Long | Oct. '81 | 1178 | 40 | 756.00 | 12 | 1,000 | | Canceled | (164,000) | (166,000) OL |
| 44. | 06/30 | Long | Dec. '81 | 1180 | 100 | 759.00 | 13 | 2,500 | | Canceled | (290,000) | (293,200) OL |
| 45. | 06/30 | Long | Oct. '81 | 1179 | 1 | 755.00 | 14 | 25 | | Canceled | (4,000) | (4,058) OL |
| 46. | 06/30 | Long | Dec. '81 | 1206 | 3 | 767.00 | 16 | 75 | | Canceled | (12,600) | (12,774) OL |
| 47. | 07/01 | Short | Feb. '82 | 1199 | 1 | 790.00 | --- | | 33 | | | |
| 48. | 08/08 | Long | Feb. '82 | 1065 | 2 | 745.00 | 23 | | 20 | Offset | (200) | (270) STCL |
| 49. | 08/21 | Short | Apr. '82 | 1196 | 2 | 783.00 | 25 | | 20 | Offset | (500) | (570) STCL |
| 50. | 08/22 | Long | Dec. '81 | 1252 | 50 | 749.70 | --- | | 1,250 | | | |
| 51. | 08/22 | Short | June '82 | 1251 | 50 | 795.70 | --- | | 1,250 | | | |
| 52. | 08/27 | Short | June '82 | 1256 | 34 | 796.00 | --- | | 850 | | | |
| 53. | 08/27 | Long | Dec. '81 | 1257 | 34 | 747.00 | --- | | 850 | | | |
| 54. | 08/29 | Long | Dec. '81 | 1263 | 16 | 749.50 | --- | | 400 | | | |
| 55. | 08/29 | Short | June '82 | 1262 | 16 | 799.00 | --- | | 400 | | | |
| 56. | 09/11 | Short | June '82 | 1287 | 75 | 871.00 | --- | | 2,475 | | | |
| 57. | 09/11 | Long | Feb. '82 | 1190 | 75 | 832.00 | 32 | 1,875 | | Canceled | (360,000) | (364,350) OL |
| 58. | 09/11 | Long | Feb. '82 | 1190 | 3 | 849.00 | 32 | 75 | | Canceled | (19,500) | (19,674) OL |

## APPENDIX II--Continued

| | Date 1980 | Position | Delivery date | Contract No. | Quantity | Price | Closes (line) | Cancellation/ assignment fee | Commission | Method of disposition | Recognized gain or (loss) | Total amt. claimed (per return) and character |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 59. | 09/29 | Short | June '82 | 1400 | 15 | $853.50 | --- | | $375 | | | |
| 60. | 09/29 | Long | Aug. '81 | 1399 | 15 | 755.50 | --- | | 375 | | | |
| 61. | 09/29 | Long | Aug. '81 | 1398 | 2 | 769.50 | --- | | 66 | | | |
| 62. | 09/30 | Long | Aug. '81 | 1373 | 30 | 757.00 | --- | | 750 | | | |
| 63. | 09/30 | Short | June '82 | 1300 | 30 | 855.00 | --- | | 750 | | | |
| 64. | 09/30 | Long | Aug. '81 | 1372 | 4 | 756.00 | --- | | 132 | | | |
| 65. | 10/17 | Long | Feb. '82 | 1190 | 2 | 800.00 | 32 | $50 | | Canceled | ($3,200) | ($3,316) OL |
| 66. | 10/23 | Long | Feb. '82 | 1190 | 1 | 768.00 | 32 | | 10 | Offset | 1,600 | 1,557 STCG |
| 67. | 10/23 | Short | Feb. '82 | ? | 1 | 738.00 | --- | | 25? | | | |
| 68. | 11/03 | Long | Aug. '81 | 1619 | 30 | 717.50 | --- | | 750 | | | |
| 69. | 11/03 | Short | June '82 | 1620 | 30 | 815.50 | --- | | 750 | | | |
| 70. | 11/03 | Long | Aug. '81 | 2846 | 4 | 727.00 | --- | | 132 | | | |
| 71. | 11/17 | Long | Feb. '82 | 1182 | 2 | 736.00 | 19 | | 20 | Offset | 400 | 314 STCG |
| 72. | 11/17 | Long | June '82 | 1287 | 1 | 769.50 | 56 | | 10 | Offset | 10,150 | 10,107 STCG |
| 73. | 12/29 | Short | Oct. '82 | 2860 | 38 | 756.70 | --- | | 1,254 | | | |
| 74. | 12/29 | Long | Feb. '82 | 1183 | 30 | 693.70 | 18 | 1,050 | | Assigned | 145,500 | 143,700 LTCG |
| 75. | 12/29 | Long | Feb. '82 | 1065 | 8 | 693.70 | 23 | 280 | | Assigned | 40,240 | 39,760 LTCG |
| 76. | 12/30 | Short | Oct. '81 | 2983 | 105 | 662.30 | --- | | 3,465 | | | |
| 77. | 12/30 | Short | Oct. '81 | 2982 | 45 | 662.40 | --- | | 1,485 | | | |
| 78. | 12/30 | Long | Feb. '82 | 1184 | 80 | 694.00 | 17 | 2,800 | | Assigned | 320,000 | 315,200 LTCG |
| 79. | 12/30 | Long | Feb. '82 | 1183 | 70 | 694.00 | 18 | 2,450 | | Assigned | 337,400 | 333,200 LTCG |

APPENDIX III

DON A. CZARNESKI
1980-1981 GOLD FUTURES TRANSACTIONS
(Gold = 100 Troy Ounces)
F. G. HUNTER PROGRAM

ACCOUNT No. 30026

| | Date | Position | Delivery date | Contract No. | Quantity | Price | Closes (line) | Cancellation/ assignment fee | Commission | Method of disposition | Recognized gain or (loss) | Total amt. claimed (per return) and character |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **1980** | | | | | | | | | | | |
| 1. | 06/30 | Short | Apr. '82 | 1111 | 10 | $792.00 | -- | -- | $500 | | | |
| 2. | 06/30 | Long | Feb. '82 | 1112 | 10 | 784.00 | -- | -- | 500 | | | |
| 3. | 06/30 | Long | Feb. '82 | 1113 | 10 | 777.40 | -- | -- | 500 | | | |
| 4. | 06/30 | Short | Oct. '81 | 1114 | 10 | 755.60 | -- | -- | 500 | | | |
| 5. | 09/25 | Short | Dec. '81 | 1344 | 10 | 837.60 | -- | -- | 500 | | | |
| 6. | 09/25 | Short | Dec. '81 | 1345 | 10 | 824.40 | -- | -- | 500 | | | |
| 7. | 09/25 | Long | Apr. '82 | 1111 | 10 | 865.00 | 1 | $250 | | Canceled | ($73,000) | ($73,000) OL |
| 8. | 09/25 | Long | Oct. '81 | 1114 | 10 | 818.00 | 4 | 250 | | Canceled | (62,400) | (62,400) OL |
| 9. | 12/17 | Long | Aug. '81 | 3514 | 10 | 640.50 | -- | -- | 500 | | | |
| 10. | 12/17 | Short | Feb. '82 | 1112 | 10 | 692.00 | 2 | | 100 | Offset | (92,000) | (92,000) OL |
| | **1981** | | | | | | | | | | | |
| | 05/01 | | | | | | | | | | | |
| 11. | 05/01 | Short | Aug. '81 | 3514 | 10 | 510.00 | 9 | 250 | | Canceled | (130,400) | (359,600) OL |
| 12. | 05/01 | Short | Feb. '82 | 1113 | 10 | 551.10 | 3 | 250 | | Canceled | (226,300) | 300,150 LTCG |
| 13. | 05/01 | Long | Dec. '81 | 1344 | 10 | 537.45 | 5 | --- | | Assigned | 300,150 | 286,550 LTCG |
| 14. | 05/01 | Long | Dec. '81 | 1345 | 10 | 537.85 | 6 | --- | | Assigned | 286,550 | |

DON A./LYNNE C. CZARNESKI

| Month and year of contract | Long/short | Number of contracts | Acquisition date | Commission paid on acquisition | Contract price | Disposition date | Disposition price | Fees paid in conjunction with disposition | Gain (loss) before transaction costs | Transaction costs | Net gain (loss) | Character of disposition claimed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb. '82 | B | 10 | 06/30/80 | $500 | $784.00 | 12/17/88 | $692.00 | $100 | ($92,000) | $600 | ($92,600) | Offset |
| Apr. '82 | S | 10 | 06/30/80 | 500 | 792.00 | 09/25/80 | 865.00 | 250 | (73,000) | 750 | (73,750) | Cancellation |
| Oct. '81 | S | 10 | 06/30/80 | 500 | 755.60 | 09/25/80 | 818.00 | 250 | (62,400) | 750 | (63,150) | Cancellation |
| Feb. '82 | B | 10 | 06/30/80 | 500 | 777.40 | 05/01/81 | 551.10 | 250 | (226,300) | 750 | (227,050) | Cancellation |
| Dec. '81 | S | 10 | 06/30/80 | 500 | 824.40 | 05/01/81 | 537.85 | 0 | 286,550 | 500 | 286,050 | Assignment |
| Dec. '81 | S | 10 | 09/25/80 | 500 | 837.60 | 05/01/81 | 537.45 | 0 | 300,150 | 500 | 299,650 | Assignment |
| Aug. '81 | B | 10 | 12/17/80 | 500 | 640.50 | 05/01/81 | 510.00 | 250 | (130,500) | 750 | (131,250) | Cancellation |

## APPENDIX IV

### RICHARD W. LEONG
### 1980-1981 GOLD FUTURES TRANSACTIONS
### (Gold = 100 Troy Ounces)
### F. G. HUNTER PROGRAM

ACCOUNT No. 30025

| | Date | Position | Delivery date | Contract No. | Quantity | Price | Closes (line) | Cancellation/ assignment fee | Commission | Method of disposition | Recognized gain or (loss) | Total amt. claimed (per return) and character |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **1980** | | | | | | | | | | | |
| 1. | 06/30 | Short | Apr. '82 | 1115 | 5 | $792.00 | -- | -- | $250 | | | |
| 2. | 06/30 | Long | Feb. '82 | 1116 | 5 | 784.00 | -- | -- | 250 | | | |
| 3. | 06/30 | Long | Feb. '82 | 1117 | 5 | 777.40 | -- | -- | 250 | | | |
| 4. | 06/30 | Short | Oct. '81 | 1118 | 5 | 755.60 | -- | -- | 250 | | | |
| 5. | 11/11 | Long | Dec. '81 | 1693 | 5 | 696.20 | -- | -- | | | | |
| 6. | 11/11 | Short | Feb. '82 | 1116 | 5 | 714.00 | 2 | $125 | 250 | Canceled | ($35,000) | ($35,000) OL |
| | **1981** | | | | | | | | | | | |
| 7. | 05/01 | Long | Apr. '82 | 1115 | 5 | 554.35 | 1 | -- | | Assigned | 118,825 | 118,825 LTCG |
| 8. | 05/01 | Short | Feb. '82 | 1117 | 5 | 540.20 | 3 | 125 | | Canceled | (118,600) | (118,725) OL |
| 9. | 05/01 | Long | Oct. '81 | 1118 | 5 | 524.25 | 4 | -- | | Assigned | 115,675 | 115,675 LTCG |
| 10. | 05/01 | Short | Dec. '81 | 1693 | 5 | 537.50 | 5 | 125 | | Canceled | (79,350) | (79,475) OL |

RICHARD W./JUNE D. LEONG

| Month and year of contract | Long/ short | Number of contracts | Acquisition date | Commission paid on acquisition | Contract price | Disposition date | Disposition price | Fees paid in conjunction with disposition | Gain (loss) before transaction costs | Transaction costs | Net gain (loss) | Character of disposition claimed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct. '81 | B | 5 | 06/30/80 | $250 | $755.60 | 05/01/81 | $524.25 | 0 | $115,675 | $250 | $115,425 | Assignment |
| Feb. '82 | B | 5 | 06/30/80 | 250 | 777.40 | 05/01/81 | 540.20 | 125 | (118,600) | 375 | (118,975) | Cancellation |
| Feb. '82 | B | 5 | 06/30/80 | 250 | 784.00 | 11/11/80 | 714.00 | 125 | (35,000) | 375 | (35,375) | Cancellation |
| Apr. '82 | S | 5 | 06/30/80 | 250 | 792.50 | 05/01/81 | 554.35 | 0 | 118,825 | 250 | 118,575 | Assignment |
| Dec. '81 | B | 5 | 11/11/81 | 250 | 696.20 | 05/01/81 | 537.50 | 125 | (79,350) | 375 | (79,725) | Cancellation |