ALAN M. RESSER AND MELINDA B. RESSER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Resser v. Commissioner
Docket No. 18606-88
United States Tax Court
T.C. Memo 1991-423; 1991 Tax Ct. Memo LEXIS 472; 62 T.C.M. (CCH) 617; T.C.M. (RIA) 91423; August 27, 1991, Filed *472 Decision will be entered for the respondent. Charles R. Levun and John V. Ryan III, for the petitioners. Joseph T. Ferrick and James C. Lanning, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioners' Federal income tax for taxable year 1982 in the amount of $ 391,113.00, and an addition to tax under section 6661[1] for taxable year 1982 in the amount of $ 97,778.50. Respondent also determined that petitioners are liable for an increased rate of interest pursuant to section 6621(c) due to a substantial underpayment attributable to a tax motivated transaction. The issues for decision are: (1) Whether offsetting positions in stock option transactions were a "similar arrangement" protecting petitioners *473 against loss within the meaning of section 465(b)(4); (2) whether losses from stock option transactions should be disallowed because they were not entered into primarily for profit; (3) whether the claimed stock option losses, if allowable, should be characterized as capital or ordinary losses; (4) whether petitioners are liable for the addition to tax for a substantial understatement pursuant to section 6661; and (5) whether petitioners are liable for an increased rate of interest pursuant to section 6621(c) due to a substantial underpayment attributable to a tax motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and accompanying exhibits are incorporated herein. Petitioners were residents of Highland Park, Illinois, at the time their petition was filed. They filed a joint Federal income tax return for taxable year 1982 with the office of the Internal Revenue Service, Kansas City, Missouri. During taxable year 1982, Alan M. Resser (petitioner), was a member of the Chicago Board of Options Exchange (CBOE). Fundamentals of CBOE Option Trading
A stock option is the right to buy or sell *474 a particular stock at a certain price for a limited period of time. The stock in question is called the underlying stock. A stock option has two sides, a buyer's side and a seller's side. An option contemplates future rights and obligations. There are two types of options, call options and put options. In a call option, the seller (or writer) is obliged, if the buyer desires, to sell the underlying stock to the buyer at the buyer's request at any time during the life of the option. The price at which the stock underlying the option will be sold to the buyer of the option is the exercise price, also called the strike price. A CBOE call stock option affords the option buyer this right to buy for only a limited period of time; thus, each option has an expiration date. After this date, the option lapses. In a put option, the seller (or writer) of the put option is obliged, if the buyer desires, to buy the underlying stock from the put buyer at the buyer's request at any time during the life of the option, at the exercise price. Like call options, CBOE put options have expiration dates. Four specifications uniquely describe any CBOE option contract: (a) The type (put or call); *475 (b) the underlying stock name; (c) the expiration date; and (d) the strike price. For example, an option referred to as an "XYZ July 50 call" is an option to buy (a call) 100 shares (normally) of the underlying XYZ stock for $ 50 per share. The option expires in July. The price of a listed option is quoted on a per-share basis, regardless of how many shares of stock can be bought with the option. Thus, if the price of the XYZ July 50 call is quoted at $ 5, buying the option would ordinarily cost $ 500 ($ 5 X 100 shares) plus commissions. The seller (or writer) of the call option would receive $ 500 ($ 5 X 100 shares) minus commissions, if applicable. The price of the option is sometimes called the premium. The price of an option can be viewed as having two elements: The intrinsic value and the time value. Options are temporary assets because they ultimately expire or are exercised. For a call option, the intrinsic value is the positive difference, if any, between the price of the underlying stock and the strike price of the option. The remaining element of the option price is called the time value. For example, assume XYZ is trading at 48 and the XYZ July 45 call is trading *476 at 4. The premium of the call option is 4. The intrinsic value is 3 (48 - 45) and the time value is 1 (4 - 3). If XYZ is trading at 48 and the XYZ July 50 call is trading at 2, the premium is 2 and the time value is 2. The call price has no intrinsic value because the stock price is below the call's strike price. Options are often referred to as being "at the money," "in the money," or "out of the money." An option that is "at the money" has its strike price equal to the market price of the underlying stock. An option is "in the money" when it is advantageous to the owner of the option (ignoring the price at which he acquired the option) to exercise his right under the option as opposed to acquiring or selling the same number of shares in the stock market. So, disregarding the premium paid for the purchase of the call option, it is advantageous for the buyer of the call to exercise when the underlying stock price is higher than the exercise price of the option. For example, a long (bought) call option with a strike price of 100 is "in the money" when the underlying price of the stock is higher than $ 100. The buyer (owner) of the call can buy the stock cheaper from the seller *477 of the call than he could buy it in the stock market. On the other hand, a long (bought) put option is "in the money" when the underlying stock price is lower than the exercise price of the option. For example, the buyer of the put option with a strike price of $ 100 is "in the money" when the stock price is lower than $ 100. This is because the buyer of the option can sell the stock at a higher price to the seller of the put option ($ 100) than the buyer can sell it in the stock market (less than $ 100). An option is "out of the money" when it would be disadvantageous, ignoring the premium the buyer paid for the option, to exercise the option, as opposed to acquiring or selling the same number of shares in the stock market. For the owner of the put, this would be when the strike price of the option is below the market price of the stock. For example, if the put strike price is $ 100 and the underlying security is trading in the market at $ 105 per share, it would make little sense for the buyer of the put to exercise the put at $ 100 when the put buyer could simply sell the stock in the market for $ 105. Likewise, a call is "out of the money" when the price of the underlying *478 stock is below the strike price of the option, because it is cheaper to buy the stock in the market than to buy it from the seller of the call at a higher strike price. For example, the call with a $ 100 exercise price would be out of the money when the stock price is less than $ 100. Option positions at the CBOE are closed by offset, by exercise and assignment, or by expiration. Offset means that a party must obtain an equal opposite position. This is accomplished by executing an offsetting (or opposite) trade. For example, the holder of 10 long IBM June 1990 150 call options, to close the positions, must obtain 10 short IBM June 1990 150 call options. Assignment is the process of designating an option writer for fulfillment of the terms of a notice of exercise and the subsequent satisfaction of such terms. When a put writer (seller) is assigned, the writer must pay the funds to purchase the stock underlying the put option from the exercising put buyer. When a call writer (seller) is assigned, the writer must deliver the stock underlying the call to the call buyer. Notices of exercise are allocated to clearing members on random basis. Option positions are also closed by *479 expiration. Expiration occurs in the absence of exercise or assignment prior to the expiration date of the option. With respect to option trading on the CBOE, a "class" of options consists of all options on the same underlying security. A "series" of options is all options on the same underlying security at the same strike price and same expiration date and unit of trading. Option Trading Involving Spreads
A common CBOE option trading strategy that provides some potential for risk reduction is known as a "spread." A "spread" is a position consisting of both long and short options in all puts, all calls, or a combination of puts and calls. The basic strategy of a spread transaction is utilizing one option in the spread to offset the risk of another option in the spread. Theoretically, a spread position reduces, to some extent, risk and profit potential. The theoretical reduction in risk and profit potential of a spread may be altered by exercise, assignment, by offsetting a position, or through market events affecting the underlying stock. There are numerous types of spread transactions. One spread transaction sometimes used by petitioner is known as a "butterfly spread." *480 Butterfly spreads commonly consist of three separate positions. The "body" of the butterfly is a position in one series of options. The two "wings" of the butterfly are option positions in the same class but a different series. Generally, if the body is long (short), the wings are short (long). The butterfly spread is basically a balanced position; that is, the number of options in the wings, in the aggregate, equal the number of options in the body. A pure butterfly spread consists of a butterfly with wings having strike prices equidistant above and below the strike price of the body. As an example, petitioner established a Teledyne (TDY) stock option butterfly spread on October 11, 1982, as follows: [SEE TABLE IN ORIGINAL] Petitioner also utilized a "box spread" strategy involving four positions. There is both a limited risk and limited profit potential in a box spread. For example, on September 30, 1982, petitioner established the box spread *481 below:
[SEE TABLE IN ORIGINAL] Risk And Price Movement
Spread positions afford the holder some risk control. For example, if held until expiration without change, the holder of a butterfly spread has a known maximum loss and maximum profit potential. A spread position might not be held until expiration due to a reduction or closing of one or more positions by early exercise or assignment, or upon acquiring an offsetting position. If a position in a spread is changed the holder may have a different theoretical risk and profit potential. The risk in options is not equally divided. The holder of short options has, in theory, an unlimited risk. For example, assume you sell a call option with a strike price of $ 50 when the underlying stock price is $ 50. As the stock price increases, theoretically, the going price of the call option increases as well. Since the price of the stock can go up infinitely, *482 so too then can the cost of acquiring a call option to offset the short position. On the other hand, theoretically, the long option holder has a limited loss potential because the maximum amount he can lose is the premium paid for the long call. A vast number of factors influence the price (premium) of a CBOE option during its lifetime. Generally, but not always, a call will increase in price as the price of the underlying stock increases. Generally, but not always, a put will decrease in price as the price of the underlying stock increases. Therefore, the buyer of a IBM June 160 call at $ 4 when the stock is selling at $ 158 should see the price of the call increase as the price of the IBM stock moves toward $ 160. The price of a CBOE option can sometimes rise or fall even if the price of the underlying stock does not move. This can happen even to options that are significantly out of the money. The factors influencing the price movement and resulting profit or loss in CBOE options during their lifetime differ from those which influence profit or loss at expiration. For example, assume a call, IBM June 150, is priced at 1/8 on April 1, and the price of IBM is $ 120. The *483 price of IBM rises to $ 145 on April 2, and the call increases in price to 1-5/8. At this point on this particular position, if the long call were exercised, the owner of the option would be paying $ 150 for a stock that could be bought in the stock market for $ 145. The buyer could, therefore, close by offset his long call position through selling an equal number of calls and receiving 1-5/8 premium for the short calls. There has been a $ 150 profit made (excluding commissions, fees, and any other costs). At the moment of expiration, the profit or loss, excluding other circumstances, is governed by three factors: The price of the option paid or received by the trader; the strike price of the option; and the price of the underlying stock at expiration. For example, the purchaser of a call (the owner) pays a premium. If the stock price does not exceed the strike price when the option expires, the owner will lose the entire premium because the option is worthless. Such owner, at expiration, cannot make a profit (before commissions) unless the price of the underlying stock then exceeds the option strike price plus the option premium paid for the call. Therefore, excluding other *484 circumstances, if a call option is purchased with a strike price of $ 100 and a premium of $ 10 and exercised when the stock price is $ 120, the owner has theoretically made a $ 1,000 profit ($ 120 - (100 + 10) = $ 10 X 100 = $ 1,000), excluding commissions and fees. Likewise, excluding other circumstances, if on expiration the stock price is $ 100 or lower, the owner has lost $ 1,000 (the premium), plus commissions and fees. The seller or writer of a call is in effect paid the call premium by the buyer. If the seller holds the position to expiration and the buyer does not exercise, the seller retains the entire premium. If on expiration the stock price has not risen above the strike price, the writer or seller who has received the premium retains the entire premium (net of commissions paid). Generally, the seller or writer of a call cannot gain more than the amount of the call premium. The buyer of a put option is in some respects in the reverse market view, at expiration, to the buyer of a call. Unless the put buyer is able on expiration to exercise the put when the price of the stock is below the strike price, the buyer can lose the entire premium in the particular put held *485 until expiration. The buyer of a put option with a strike price of $ 100 and a premium of $ 10 would lose his entire premium if the option is held to expiration and the stock price has risen above $ 100 at expiration. Excluding other circumstances, where the stock price on expiration dropped to $ 80, the buyer of a $ 100 put option who held it at expiration would profit by $ 1,000 ($ 100 - 10 - 80 = $ 10 X 100 = $ 1,000). CBOE Background
The CBOE is a national securities exchange functioning as a central marketplace, with regulatory and surveillance requirements and the ability to disseminate price, trade, volume, and related information. The CBOE was founded and began transacting business as a securities options exchange in 1973, and was the first exchange formed for the purpose of trading options. Initially, only 16 classes of options and a total of 48 option series were traded. In 1980 through 1983, over 100 classes of options, some with hundreds of series, were traded at the CBOE. Prior to formation of the CBOE, options were traded over-the-counter with little liquidity. Liquidity exists when there is a sufficient number of buyers and sellers to provide a ready market *486 at nonartificial prices. The absence of liquidity in over-the-counter options made closing existing positions by offset difficult. The CBOE for the first time afforded buyers and sellers of options a central market with sufficient liquidity to close their open positions by offset. The CBOE is registered under the Securities Exchange Act of 1934, 15 U.S.C. sec. 78a (1978) (the Act), and is subject to the jurisdiction of the Securities & Exchange Commission (SEC). The Act defines a "dealer" as anyone engaged "in the business of buying and selling securities for his own account through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sell securities for his own account, either individually or in some fiduciary capacity, but not as part of a regular business." 15 U.S.C. sec. 78c(a)(5). Under the Act, securities include any "put, call, straddle, option, or privilege on any security." 15 U.S.C. sec. 78c(a)(10). The CBOE Market Maker Function
The rules of the SEC provide that a national securities exchange may allow members to act both as a broker and a dealer or to be limited to either acting as a broker or a dealer. 15 U.S.C. sec. 78k(b). *487 Stock exchanges, such as the New York Stock Exchange, have chosen to combine these functions. A stock exchange specialist both makes a market and executes orders. The CBOE has chosen to separate the broker and dealer functions, allowing a "specialist" to act only as a dealer. CBOE rules refer to a dealer-specialist as a market maker. CBOE Rule 8.1. The Act defines a "market maker" as any "specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out * * * as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. sec. 78c(a)(3)(g)(38). The CBOE market maker does not have the exclusivity that the stock exchange specialist has. The CBOE market maker can function only as a dealer making quotes, without knowing the customer orders that exist. The CBOE market maker is also subject to the competitive action of other market makers for the same class. The CBOE market maker is required by the SEC to maintain a liquidating equity "in respect of security positions in his market maker or specialist account * * *." 17 C.F.R. sec. 240.15c3-1(a)(6)(iii) *488 (1984). The CBOE system is intended to require market makers to provide liquidity for customer orders to be filled. First, market makers must enter transactions which are reasonably calculated to contribute to the maintenance of a fair and orderly market. Second, the market maker also is restricted in all options classes to bid (i.e., offer to buy) and ask (i.e., offer to sell) spreads of a maximum amount unless the Floor Procedure Committee establishes different maximum amounts. Further, the market maker can bid no more than $ 1 lower (or offer no more than $ 1 higher) than the last trade on a contract plus the aggregate price change in the underlying stock since the last trade, unless this requirement is waived by at least two floor officials. Pursuant to CBOE Rule 8.3, a market maker is "appointed" to one or more classes of options. The appointment may be in "groups," so that if the CBOE market maker applies for one particular class, the CBOE market maker will be appointed to others in the group. The CBOE market maker has continuous obligations for classes of option contracts for which the CBOE market maker holds appointments. Described in CBOE Rule 8.7, these obligations *489 include the obligation to engage (in certain situations to a reasonable degree under existing circumstances) in dealings in the CBOE market maker's own account. This may occur when it is reasonably anticipated that there will be a lack of price continuity, temporary supply and demand disparity in a particular option contract, or a temporary distortion between contracts in the same class. When trading in an option class in which not appointed, the market maker must also follow a course of dealings reasonably calculated to contribute to the maintenance of a fair and orderly market. In addition, the market maker must abide by bid, offer, and price restrictions. Further, the market maker may be required to respond to any call (i.e., be "called to the post") for market makers on a day in which the market maker has made transactions in a nonappointed class. Upon responding to the call, the market maker shall engage in dealings in those options to the same extent as appointed classes. Effecting CBOE Option Transactions
Any person eligible to trade CBOE options must do so in accordance with the applicable rules and regulations of the CBOE. Generally, bids and offers made and accepted *490 in accordance with CBOE Rules constitute binding contracts. A party initiating or increasing a position is making an opening transaction. A party reducing or eliminating a position is entering a closing transaction. A trade on the floor is accomplished when one party makes an outcry and another party accepts. A CBOE option transaction must be executed in open auction outcry at the trading post on the floor during normal trading hours. As an example, a market maker will outcry "sell the October 150 puts at a half," another will respond "how many times," and the market maker may respond "10 times." The other market maker may then complete the transaction by responding "buy them." Each option generally represents 100 shares of the underlying stock. In this example the market maker is offering to sell the October 1990 puts of a particular class with a striking price of $ 150. A "half" means 50 cents per share of stock. The premium for an option representing 100 shares at a "half" would be $ 50. The market maker in the example is selling 10 put options, so the premium is $ 500 (10 options X 100 shares = 1,000 X .50 = $ 500). Each party records the trade on a trading card. There *491 are separate cards for puts and calls. The trading card is submitted to the CBOE and the Options Clearing Corporation (OCC). The OCC issues a short CBOE option contract to the seller, intervening as the buyer, and issues a long CBOE option contract to the buyer, intervening as the seller. The OCC thereby assures both buyer and seller of a financially responsible party on the other side of the trade. Upon completion of this process, the transaction is considered fully complete in the eyes of the CBOE and the OCC. Accounting System
The accounting system utilized in determining gains and losses in the instant case was a first-in, first-out system except that day trades (buy and sell the same options in the same day) were netted against each other in determining the positions for the day. Petitioner's Activities
Petitioner attended the University of Illinois, receiving a bachelor's degree in finance in 1963. From April 19, 1973, through the taxable year at issue, 1982, petitioner was a member of the CBOE and a registered market maker. Petitioner held market maker status in appointed stock options that he traded at the CBOE. Petitioner selected the options in which he *492 desired to be appointed and amended his appointments from time to time. Petitioner was never denied appointment to a specific option class. As of October 1, 1981, petitioner's appointed stocks included: [SEE TABLE IN ORIGINAL] These appointments remained constant until April 1, 1982, when petitioner added Toys R' Us (TOY) and deleted Houston Oil (HOI). Petitioner's appointed stocks remained the same for the balance of 1982. During taxable year 1982, petitioner entered into option transactions involving the following classes of CBOE listed options: [SEE TABLE IN ORIGINAL] During taxable year 1982, petitioner *493 made stock option trades in two accounts, account AMR and account QRF. Account QRF was designated with the acronym RSR for the first few months of 1982 and later changed to QRF because of a CBOE rule change. Only transactions in account QRF are at issue in this case. Throughout 1982, account AMR was registered in the name of Bichon Venture (Bichon), an Illinois limited partnership. Petitioner's wife, Melinda B. Resser, was a general partner of Bichon. Petitioner was the managing general partner of Bichon. Pursuant to the partnership agreement of Bichon, petitioner was entitled to receive the first $ 48,000 of profits realized by Bichon on an annual basis plus 33 percent of the balance of such net profits. Losses of the partnership were allocated based on each partner's capital contribution. As of January 1, 1982, the capital accounts of petitioners represented approximately 2.5 percent of the total capital of the partnership. As of December 31, 1982, petitioners' capital accounts decreased in the amount of $ 157 which equaled petitioners' share of the Bichon partnership loss reported on their 1982 U.S. Individual Income Tax Return, Schedule E. The vast majority of petitioner's *494 option trading activity was done for the Bichon Venture Partnership, account AMR. Petitioner's trading activities with respect to the AMR account were regular and continuous as he engaged in trading on almost a daily basis. Petitioner entered into transactions involving Baxter Travenol Laboratories, General Foods Corp., Honeywell, Inc., and International Business Machines in the AMR account. From April 1, 1982, through December 31, 1982, petitioner entered into a total of 10,077 option transactions in the AMR account. For this same period, petitioner entered into only 29 option transactions in account QRF, each involving Teledyne (TDY) stock options. The TDY option transactions in the QRF account are the only transactions in dispute. [2]
*495 Account QRF was a joint account registered in the name of petitioner and Rialcor Securities Corp. (Rialcor), the CBOE member firm of which petitioner was a one-third owner and through which he cleared all his trading activities at all times relevant to this case. Pursuant to an oral agreement, petitioner received 90 percent of the profits and losses realized in account QRF and Rialcor received the balance. From February 26, 1982, through September 29, 1982, no positions were held and no trades were executed by petitioner in account QRF. Between September 30 and October 14, 1982, petitioner entered into 26 TDY transactions on 5 different days. After October 14, 1982, petitioner did not execute any stock option transactions in account QRF until December 17, 1982. After petitioner's December 17, 1982, stock option spread, no other transactions were executed during the remainder of 1982. For taxable year 1982, petitioners reported a $ 250,671 loss from stock option investments on Schedule C of their Federal income tax return (Form 1040). Included in the Schedule C loss were $ 804,336 of losses and $ 555,176 of gains from stock option spread transactions from accounts RSR and QRF. *496 In addition to the $ 249,160 of excess loss ($ 555,176 minus $ 804,336), a $ 1,511 deduction for expenses related to petitioner's trading activity was taken which resulted in a Schedule C net loss of $ 250,671. For taxable year 1982, petitioners' Wage and Tax Statements (W-2 Forms) reported compensation of $ 251,413 consisting of $ 236,550 earned by petitioner as a risk manager for Rialcor and $ 14,863 of compensation earned by Melinda B. Resser. Petitioner also earned $ 42,975 from consulting and director fees. Petitioners' 1982 taxable income was $ 3,526 and their tax liability was zero. The taxable income was computed as follows: [SEE TABLE IN ORIGINAL] A typical workday for petitioner began with a breakfast business meeting with Richard Kushnir, a co-owner of Rialcor. After the business meeting, petitioner reviewed the daily trading sheets of approximately 40 *497 traders in his performance of risk management duties for Rialcor. Next, petitioner would analyze his own trading positions and prepare for the day's trading. Petitioner spent approximately 6-1/2 hours a day trading in BAX, GF, HON, and IBM options for the AMR account. The exact amount of time spent by petitioner trading for the QRF account is not known but it appears to have been de minimis. Account QRF Option Spreads
Petitioner traded only TDY options in the QRF account and did not execute any TDY option transactions in the AMR account. TDY stock prices were volatile during 1982. Petitioner's TDY option trades in the QRF account for 1982 can be summarized as follows: [SEE TABLE IN ORIGINAL] *498 On September 30, 1982, petitioner entered into the following TDY box spread: [SEE TABLE IN ORIGINAL] TDY stock closed at 89-3/4 on September 30, 1982. If the price of TDY stock declined from 89-3/4 to 70 or below; the September 30 box spread would be profitable. On September 30, 1982, petitioner established the following butterfly spread position: [SEE TABLE IN ORIGINAL] This butterfly spread would achieve its optimum profitability if the TDY stock price decreased to 80. The September 30 TDY stock option transactions all occurred within a 10-minute time period. On October 1, 1982, petitioner established a position that could be described as a "double box" spread or as two butterfly spreads. The spread consisted of the following: [SEE TABLE IN ORIGINAL] As with the September 30 spreads, the October 1 position would be able to generate profit if the price of TDY declined. *499 For example, if TDY declined below $ 75, petitioner could exercise his long January 75 put to earn interest income from a short stock rebate. The October 1 transactions were reported as having occurred within a 16-minute time period. On October 11, 13, and 14, 1982, petitioner entered into 12 positions comprising 4 butterfly spreads. From these four spread trades, petitioner closed certain positions and realized net losses in the amount of $ 1,121,148. A portion of these losses, $ 188,896, was generated on October 11, 1982, when petitioner closed out the January 65 call leg from his October 1 TDY transaction. On October 13, 1982, petitioner closed out an April 70 call leg from a September 30 spread and realized a $ 275,181 loss. On October 14, 1982, petitioner established an April 70-80-90 butterfly call spread (100 + 100 short on the wings/200 long on the body) and realized losses of $ 448,040. Petitioner also entered into a January 65-75-85 butterfly call spread which netted losses of $ 209,031. Petitioner's net losses claimed from the few trades occurring on September 30, October 1, 11, 13, and 14, 1982, amounted to $ 1,121,148. This amount exceeded petitioners' earned *500 wages and other stock option trading gains in Superior Oil Corporation (SOC) which had been closed out in February 1982. For the balance of 1982, petitioner executed stock option trades in the QRF account on only one other date, December 17, 1982. On that date, petitioner entered into a TDY spread and realized a net gain of $ 227,442. The December 17 spread reduced petitioner's net trading losses in account QRF from $ 1,121,148 to $ 893,706. Petitioner's share of the $ 893,706 loss (90 percent) equaled $ 804,335. Petitioner's Schedule C loss reduced petitioners' gross income significantly. Petitioners' tax liability for 1982, as reported, was zero. Petitioner's Customer Account Status Report for December 17, 1982, indicated that open option positions in the QRF account contained unrealized gains of $ 872,075. The net gains realized in 1983 resulting from closure of positions open on December 17, 1982, totaled $ 871,874. The actual economic loss from the account QRF/TDY spread trades petitioner engaged in from September 1982 through April 1983 was $ 21,832. OPINION Respondent argues that the stock option spread losses are not deductible because petitioner's offsetting option *501 positions constitute a "similar arrangement" under which petitioner was not at risk within the meaning of section 465(b)(4). Respondent also contends that the spread losses are not deductible because they were not entered into primarily for profit as required by section 165. Alternatively, respondent argues that if the losses are allowed at all, they should be capital losses rather than ordinary losses, because petitioner was not a dealer with respect to the trades at issue. Expert Testimony
As a preliminary matter it should be noted that both petitioners and respondent offered expert reports into evidence. Petitioners' experts opined that the CBOE option transactions at issue were typical transactions entered by CBOE option traders. Respondent's expert witness concluded that petitioner's overall trading pattern in account QRF was atypical for a trader attempting to generate a profit. Prior to trial, petitioners filed a motion in limine objecting to the admissibility of respondent's expert witness report. Petitioners argued that respondent's expert improperly offered opinions as to the legal issues in the case. Petitioners also argued that the economic analysis presented *502 in the expert report was based on unrealistic and unreliable factual premises, and therefore would be of no assistance to the Court. For example, respondent's expert evaluated the profit potential of certain option positions assuming the positions would be held until expiration. We agree with petitioners that certain statements contained in the expert report were improper conclusions as to legal issues and that respondent's expert also utilized unrealistic factual assumptions in parts of his analysis. In fact, although admitted into evidence, we found respondent's expert report of little or no assistance and unnecessary in deciding the issues of this case. In petitioners' objection to the admissibility of the respondent's expert report, they cited Laureys v. Commissioner, 92 T.C. 101, 122-129 (1989), as support for the position that the report should be inadmissible since it was objectionable for the same reasons espoused in Laureys. We agree that respondent's expert report in the instant case contained some of the problems discussed in the Laureys case although not to the same degree. Moreover, this Court in Laureys stated that the improprieties *503 in that expert report provided reasons that "could well be given for giving little or no weight to the expert testimony if it were received in evidence." Laureys v. Commissioner, supra at 127. As stated above, we found respondent's expert report unhelpful and unnecessary in making our factual findings. The testimony of the other witnesses, the exhibits, and the stipulations of fact were sufficient evidence to decide the issues in this case. We also carefully considered petitioners' expert reports and found them to be redundant and of little or no assistance in making our findings in this case. Section 465(b)(4)
Section 465 was adopted to insure that a taxpayer may deduct losses from an activity only to the extent that he or she is economically or actually at risk for the investment. A taxpayer is at risk for the amount of money that he or she contributes to an activity and for amounts borrowed for which he or she is personally liable. Sec. 465(b)(1) and (2). Amounts at risk, however, do not include "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). Applicability *504 of section 465 is determined on the basis of facts existing at the end of the taxable year. Capek v. Commissioner, 86 T.C. 14, 48 (1986). Respondent argues that petitioner's stock option spread technique is the type of risk limiting device that Congress contemplated when it utilized the phrase "other similar arrangements" in section 465(b)(4). Respondent contends that petitioner's option spread technique effectively insulated petitioners from any real economic loss. In Laureys v. Commissioner, supra at 131, this Court addressed the exact issue and stated: Respondent's argument hinges on the assertion that the term "similar arrangement" in section 465(b) includes the historically notorious area of tax straddles. We are unpersuaded that Congress intended to deal with the problems of options straddles or spreads by general language in that section. Section 465 is relatively detailed and has been amended many times. The phrase "similar arrangement" is not specifically defined anywhere in the Internal Revenue Code or in the legislative history of section 465. It is understood to be used in the context of immunizing an investor from *505 economic losses in an "unprofitable" transaction. See Levy v. Commissioner, 91 T.C. 838 (1988); Porreca v. Commissioner, 86 T.C. 821, 832 (1986). There is no reason to believe that Congress would use a catchall phrase to deal with such specific and well-known means of shifting tax liabilities from one year to another.
We follow the reasoning and position espoused in Laureys and similarly hold that petitioner's stock option spread technique is not a "similar arrangement" within the meaning of section 465(b)(4). Therefore, we conclude that section 465(b)(4) does not limit petitioner's losses in this case. Petitioner's Profit Motive
Respondent contends that petitioner's trades were motivated primarily by tax considerations and were a blatantly obvious attempt to offset all earned wages and other income. Petitioner argues that he entered into the TDY stock option transactions to generate a profit and that his TDY option trading activity constituted a trade or business. Section 165(c)(1) provides that, for individuals, losses are limited to those incurred in a trade or business. In Groetzinger v. Commissioner, 82 T.C. 793, 800 (1984), *506 affd. 771 F.2d 269 (7th Cir. 1985), affd. 480 U.S. 23, 94 L. Ed. 2d 25, 107 S. Ct. 980 (1987), we noted that trading securities for one's own account can constitute a trade or business if the trading is sufficiently frequent and substantial. In its affirmation in Groetzinger, the Supreme Court stated that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and the taxpayer's primary purpose for engaging in the activity must be for income or profit. Groetzinger v. Commissioner, 480 U.S. 23, 35, 94 L. Ed. 2d 25, 107 S. Ct. 980 (1987). Petitioners argue that to determine whether petitioner was engaged in a trade or business with respect to his account QRF trading, we should aggregate his activity on behalf of the Bichon Venture Partnership (AMR account) with the activity he reported as a sole proprietorship (RSR and QRF accounts) on Schedule C. We find petitioners' argument wholly lacking in merit. This Court has recognized in the past that an individual may have separate and distinct activities within the same broad category of business. See Pritchett v. Commissioner, 63 T.C. 149, 162-163 (1974); see also *507 Williamson v. Bowers, 120 F. Supp. 704 (D.C. S.C. 1950). In Pritchett v. Commissioner, supra at 163, we held that certain parcels of real estate sold by the taxpayer could receive capital treatment and other parcels could be characterized as ordinary, depending on whether or not the parcels were held primarily for sale to customers in the ordinary course of a trade or business. The record in this case clearly reflects that the activity in account QRF was separate and distinct from petitioner's Bichon Venture/AMR account trading activity. Petitioner was involved in no less than four distinct activities during the year: (1) His employment as a risk analyst for approximately 40 traders clearing through Rialcor (with compensation of $ 236,550); (2) his daily activities on behalf of the Bichon Venture Partnership (his portion of which was reported on Schedule E of his return); (3) his work as a consultant (earning $ 40,775); and (4) his account RSR and QRF activity described as "Investments" on Schedule C of his return. Petitioner's other trading related activities were separate and distinct from his account QRF trading. Specifically, the *508 account AMR and account QRF trading were accounted for and reported separately. The Bichon Venture Partnership was a separate legal entity which received the benefits and the burdens of the trades made by petitioner for account AMR. Therefore, petitioner's attempt to recast his QRF trading in the light of his frequent and substantial AMR trading is without merit. Since petitioner's Schedule C activity must be evaluated separately, we hold that his personal trading activity in the RSR/QRF account was not conducted with the regularity or continuity necessary to be considered a trade or business. Petitioner traded in the RSR/QRF account on only 13 different days during the year. The trading on seven of those days, in February 1982, involved closing spread positions carried over from the prior year. No trading occurred from the beginning of March until September 30, 1982. For the balance of the year, petitioner traded TDY on only 6 days, establishing only 9 spreads. Petitioner testified that making a trade could take just seconds to execute. No testimony was introduced which demonstrated the duration of time petitioner actually remained in the TDY trading pit. Petitioner has *509 not demonstrated whether his TDY trading activities consumed only a few minutes during the year or a significant portion of several days. The record indicates that petitioner spent his time trading on a daily basis for the Bichon partnership account, handling risk analyst duties for Rialcor, and performing consulting services. Therefore, we conclude that petitioner's insubstantial and infrequent trading in TDY stock options did not constitute a trade or business. Section 165(c)(2) states that, in the case of an individual, losses are limited to those incurred in transactions "entered into for profit, though not connected with a trade or business." In Miller v. Commissioner, 836 F.2d 1274, 1280 (10th Cir. 1988), the Tenth Circuit cited Helvering v. National Grocery Co., 304 U.S. 282, 289 n.5, 82 L. Ed. 1346, 58 S. Ct. 932 (1938), and noted that the "meaning of 'transaction entered into for profit' has been settled at least since 1938, when the Supreme Court indicated that a subjective standard is applied and the taxpayer's primary motive must be one of profit." This Court has consistently held that in order to deduct a loss under section 165(c)(2) the taxpayer must show *510 that profit was the primary motivation. Ewing v. Commissioner, 91 T.C. 396, 416 (1988); Boswell v. Commissioner, 91 T.C. 151, 158-159 (1988); Fox v. Commissioner, 82 T.C. 1001, 1019-1022 (1984). Petitioner bears the burden of proving that he executed the TDY stock option spread transactions primarily for the purpose of obtaining an economic profit independent of tax savings, in order to deduct the related losses. Rule 142 (a); Ewing v. Commissioner, supra.
This does not mean that losses influenced by tax planning are not deductible under section 165(c)(2). Losses from a transaction entered into partly for tax-avoidance may still be allowable under section 165(c)(2), provided the required nontax profit motive predominates. In other words, the tax tail cannot wag the business judgment dog. The test of deductibility is one of degree, considering the facts and circumstances surrounding the transaction. Miller v. Commissioner, supra at 1279. We hold that petitioner has failed to prove that he entered into the transactions at issue primarily for profit. The evidence *511 introduced at trial consisted primarily of petitioner's testimony. Both respondent and petitioner introduced expert testimony which we found redundant and unenlightening. We place little weight on petitioner's testimony, which was overly general, vague, and, on occasion, inconsistent. Greater weight should be given to the objective facts than to petitioner's self-serving testimony regarding intent. Fox v. Commissioner, supra at 1022; Siegel v. Commissioner, 78 T.C. 659, 699 (1982). Petitioner testified that his function as a market maker was to make a market and maintain liquidity in the marketplace. However, petitioner traded on only 6 days in TDY stock options for the QRF account and provided no testimony concerning the amount of time actually spent in the TDY trading pit. Petitioner also testified that the reason he established and utilized the separate QRF account, in which he received 90 percent of profits and losses, was to relieve the co-owners of Rialcor from the potential risk of trading in the volatile TDY market. Yet when attempting to explain why he entered into two October 14 spreads which generated $ 657,071 of losses *512 he stated that the co-owners of Rialcor thought there was too much risk in TDY positions so he needed to close several positions. We also find it incredible that petitioner only worked 30 to 45 minutes a day in the performance of his risk management duties for which he was compensated $ 236,550 in taxable year 1982. We are unpersuaded that petitioner's primary purpose for engaging in stock option spreads was to make a profit. In January 1982, petitioner failed to transact any stock option trades in the RSR account. In February, petitioner closed out one box spread that he had established in 1981. From March until the end of September, petitioner did not enter into any stock option trades in the newly named QRF account. In a 2-week period, from September 30 to October 14, petitioner generated losses of $ 1,121,148. From October 15 to December 16, petitioner did not trade in the QRF account. On December 17, 1982, petitioner established his last spread for the year. The December 17 three-way box spread resulted in a net gain of $ 227,442. This reduced petitioner's overall QRF trading losses to an amount which exceeded the account RSR/QRF trading gains and his wages from Rialcor. *513 In addition, the TDY trading losses resulted in petitioners' paying zero tax for taxable year 1982. Petitioner was an experienced, sophisticated trader in option transactions, with the knowledge and background to make his own trading decisions. To execute the loss generating trades, petitioner established and used an account other than the one in which he conducted his primary trading activities. Petitioner was undoubtedly aware of the favorable tax consequences arising from the offset of losses reported on Schedule C, Form 1040, against other income and deferring trading gains to subsequent years. That is, petitioner had Schedule C trading losses of $ 141,721 in taxable year 1981, which significantly reduced his taxable income and tax liability for 1981. Petitioner's overall trading pattern also indicates that the transactions were primarily tax-motivated. Petitioner traded on only 6 days in the QRF account, establishing a total of 9 spreads. The spreads established on September 30 and October 1 did not close any previously acquired leg and no gains or losses were realized on those dates. On October 11, 1982, petitioner's trading resulted in the realization of a $ 188,896 *514 loss. On October 13, 1982, petitioner established a butterfly spread and simultaneously closed an April 70 call leg realizing a loss of $ 275,181. On October 14, 1982, petitioner's closing of prior transactions resulted in a net loss of $ 657,071. On October 14, 1982, petitioner's Customer Account Status Report disclosed that he had open positions in his account containing unrealized profits totaling $ 1,139,837. If petitioner would have closed all his positions on October 14, the net economic gain would have been approximately $ 18,689. The record indicates that petitioner consistently liquidated his loss legs and left the majority of his profitable legs open until the next taxable year. Petitioner's Customer Account Status Report for December 17, 1982, indicated that the open positions in his account contained unrealized profits of $ 872,075. The net gains realized in 1983 resulting from the closure of those open option positions as of December 17, 1982, totaled $ 871,874. We also do not place great weight on the fact that had the price of TDY stock declined measurably, some of petitioner's TDY spreads would have been profitable. It is uncontested that the potential for *515 profit exists in stock option spread transactions like those engaged in by petitioner, as does the potential for economic loss. However, the fact that there is a reasonable expectation of profit is not determinative. Ewing v. Commissioner, supra at 416. The relevant test is whether petitioner's primary purpose for entering stock option spread transactions was for profit. We agree with respondent that the TDY trades at issue were not primarily profit motivated. Petitioner asserts that the facts in Laureys v. Commissioner, 92 T.C. 101 (1989), are similar enough to the facts in this case to warrant a determination that the motivation of petitioner was the same as the taxpayer in Laureys. We disagree with petitioner and conclude that the instant case is factually dissimilar in many important respects. First, we note that the taxpayer in Laureys relied almost exclusively on his trading activities in stock options as his sole source of income. The taxpayer received practically no other income. In contrast, petitioners had wages of approximately $ 250,000 as well as consulting income in excess of $ 40,000. Petitioners' need for *516 offsetting tax losses to reduce a substantial amount of taxable income is apparent. Moreover, with other sources of income, it is evident that petitioners were not forced to rely on the TDY trading gains to earn a living. The taxpayer in Laureys engaged in market making for his own account on a full-time basis. In the instant case, petitioner entered into just 9 TDY spread transactions on only 6 days for his own account during the year (excluding the spread closed out in February 1982). Petitioner spent the majority of his time as a risk analyst, consultant, and trading for the Bichon Venture Partnership/AMR account. The taxpayer in Laureys traded in at least eight different option classes whereas petitioner traded only TDY stock options in the QRF account. In Laureys, the taxpayer attempted to vary his strategy behind the trades in his account. He was sometimes bullish, sometimes bearish, and sometimes attempting to capture a dividend. Petitioner's testimony is that he maintained a bearish strategy with respect to the TDY trades. Therefore, we find that the facts in Laureys are distinguishable from those of this case. We note that the tax benefits of petitioner's *517 option spreads strategy so far outweighs the economic profit potential that we cannot accept petitioner's contention that he was primarily motivated by the desire to earn a profit. We have considered petitioners' other arguments and find them unpersuasive and without merit. We therefore sustain respondent's determination with respect to petitioner's losses from the TDY stock option trading in account QRF. Because the losses are not allowable, it is unnecessary for us to decide whether the losses should be characterized as capital or ordinary losses. Addition To Tax Under Section 6661
Section 6661(a) provides for an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement. Section 6661(b)(1)(A) defines "substantial understatement" as an understatement of tax for any taxable year in excess of the greater of 10 percent of the tax required to be shown on the return for the year, or $ 5,000. Section 6661(b)(2)(B) provides for a reduction of the understatement if there is or was substantial authority for the position taken by the taxpayer, or if the taxpayer meets certain disclosure requirements. Section *518 6661(b)(2)(C) states that in the case of any item attributable to a tax shelter, there must be substantial authority for the taxpayer's position and he must also have reasonably believed that the tax treatment of such item was more likely than not the proper treatment. Section 6661(b)(2)(C) defines "tax shelter" as any investment plan or arrangement, or any other plan or arrangement, if the principal purpose of such plan or arrangement is the avoidance of Federal income tax. Section 1.661-5(b)(1)(iii), Income Tax Regs., states that the principal purpose of a plan or arrangement is avoidance of Federal income tax if that purpose exceeds any other purpose. We hold that petitioner's principal purpose for the stock option trading in account QRF was the avoidance of Federal income tax and therefore that such trading activity meets the definition of a tax shelter in section 6661(b)(2)(C). In addition, petitioner had no substantial authority for the tax treatment of his TDY trading in taxable year 1982. Section 1.6661-3(a)(2), Income Tax Regs., provides that the substantial authority standard is stricter than the reasonable basis standard. The regulation also states that a position *519 with respect to the tax treatment of an item that is "arguable but fairly unlikely to prevail in court would satisfy a reasonable basis standard, but not the substantial authority standard." In the instant case, petitioners rely heavily on Laureys v. Commissioner, supra, to support the position that petitioner's trading was profit motivated. Although we think petitioner's position is arguable, the facts in Laureys are materially distinguishable from those of this case. Therefore, petitioner's position might arguably satisfy the reasonable basis standard but falls short of satisfying the substantial authority standard. Respondent's determination on this issue is sustained, and petitioners are liable for the addition to tax under section 6661. Increased Interest Under Section 6621(c)
The increased interest provided by section 6621(c) is proper where there is a "substantial underpayment" (an underpayment exceeding $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." The increased interest accrues after December, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552, 555-557 (1985), *520 affd. without published opinion 795 F.2d 1005 (2d Cir. 1986); Neely v. Commissioner, 85 T.C. 934 (1985). Section 6621(c)(3)(B) provides the Secretary of the Treasury with the authority, by regulation, to add to the categories of transactions that under section 6621(c) will be treated as tax motivated transactions. Under that grant of authority the Secretary has promulgated section 301.6621-2T, Temporary Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50391 (Dec. 28, 1984), 1985-1 C.B. 368, which includes in tax motivated transaction any underpayment attributable to a deduction disallowed under section 165(c)(2). Sec. 301.6621-2T, Q & A-4, Temporary Proced. & Admin. Regs. In Ewing v. Commissioner, supra at 422-423, we concluded that the increased interest described in section 6621(c) was applicable to underpayments attributable to a deduction disallowed under section 165(c)(2). In the instant case petitioner did not satisfy the test of deductibility of losses under section 165(c)(2). We held that petitioner's stock option spread transactions were not entered into for profit. Consequently, *521 any underpayment of tax by petitioner which is based on the losses from petitioner's TDY stock option trading is attributable to a tax motivated transaction and subject to the increased interest provided by section 6621(c). In light of the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. For the first 3 months of 1982, the QRF account was entitled the RSR account. In February, petitioner entered 27 option transactions on 7 different days, each involving Superior Oil Corporation (SOC) stock options. Respondent did not challenge the SOC transactions in the RSR account because the transactions merely closed option positions that were open as of December 31, 1981.↩